**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

**In re DETERMINATIONS UNDER §§ 211(h)(2) AND 211(h)(3) OF the RAIL ACT.**

**No. Bky 70–347.**

United States District Court, E. D. Pennsylvania.

April 2, 1976.

Duane, Morris & Heckscher by William R. Traub, Philadelphia, Pa., for the trustee, Lehigh Valley Railroad Co.

Sullivan & Worcester by Morris Raker, Boston, Mass., and Gratz, Tate, Spiegel, Ervin & Ruthrauff by Spencer Ervin, Jr., Philadelphia, Pa., for Richard Joyce Smith, Trustee, New York, New Haven & Hartford Railroad Co.

Pepper, Hamilton & Scheetz by John G. Harkins, Jr., Philadelphia, Pa., for Consolidated Rail Corp.

Wilmer, Cutler & Pickering by William R. Perlik, and Stephen F. Black, Washington, D. C., for United States Railway Assn.

Rogers & Wells by William R. Glendon, New York City, and Clark, Ladner, Fortenbaugh & Young by Edward C. Toole, Jr., Philadelphia, Pa., for Committee of Interline Railroads.

Goodman & Ewing by William H. Ewing, Philadelphia, Pa., for Connecting Railway Co.; Trustee of Delaware Railroad Co.; Trustee of Philadelphia, Baltimore & Washington Railroad Co.; Trustee of United New Jersey Railroad & Canal Co.; Trustee of New York & Harlem Railroad Co.; Trustee of Fort Wayne & Jackson Railroad Co.; Trustee of New York Connecting Railroad Co.; Trustee of Little Miami Railroad Co.

Willkie, Farr & Gallagher by Walter H. Brown, Jr., and Thomas Bryan, New York City, for Institutional Investors Penn Central Group.

Ballard, Spahr, Andrews & Ingersoll by Frederic L. Ballard, Richardson Blair, James D. Coleman, and Lewis A. Grafman, Philadelphia, Pa., for Institutional Investors, Schedule A Indenture Trustees, and for Indenture Trustees (in Lehigh Valley proceeding).

Jerome Sharfman, Dept. of Transp., Washington, D. C., for the United States of America.

Henri F. Rush, Washington, D. C., for the Interstate Commerce Commission.

David Berger, P. A. by Daniel Berger, Philadelphia, Pa., for Penn Central Co.

Covington & Burling by Charles Horsky, Washington, D. C., and James Howard, and Paul R. Duke, Philadelphia, Pa., for the trustees, Penn Central Transp. Co.

Richard R. Bongartz, Westport, Mass., for the Trustees, Penn Central Transportation Co. (in Lehigh Valley proceeding).

Robert Redmon, Washington, D. C., for Ford Motor Co.

## MEMORANDUM IN SUPPORT OF ORDER NO. 2297

FULLAM, District Judge.

The Regional Rail Reorganization Act of 1973, as amended by the Railroad Revitalization and Regulatory Reform Act of 1976 (together hereinafter referred to as "the Rail Act"), now contains § 211(h), 45 U.S.C. § 721(h), which is intended to provide at least partial solutions to some of the problems surrounding the orderly transfer of rail assets and operating responsibilities from the bankrupt railroads to Consolidated Rail Corporation (Conrail) as of April 1, 1976. Section 211(h) requires that certain issues be presented to and determined by the reorganization courts in advance of the conveyance date. The proceedings now before the Court are pursuant to that mandate.

In the extremely brief time between enactment of § 211(h) and the March 31, 1976 deadline for decision by the Court, the parties have been required to negotiate concerning, and formulate positions upon, numerous issues of great magnitude and complexity. In conformity with the schedule adopted at the suggestion of United States Railway Association ("USRA"), hearings were held in this Court on March 22 and March 25, 1976. The pre-hearing period was devoted to development of the necessary information, negotiation, and identification of the issues to be presented to the Court for decision. Evidentiary material submitted at the hearings included a number of depositions, the precise impact of which had not then been fully analyzed; and additional issues surfaced at the hearings. Accordingly, it was necessary to afford the parties until March 29, 1976, for the filing of briefs. Supplemental and reply briefs were filed thereafter; indeed, the brief of the Interstate Commerce Commis-

sion was received on the morning of March 31, 1976, the last day for rendering a decision in accordance with the Congressional mandate.

In view of the time pressures, I filed, on the afternoon of March 31, 1976, a brief statement listing the conclusions reached by the Court on the issues submitted for decision, and entered Order No. 2297 incorporating those conclusions. This Opinion is now being filed, still in some haste, in order to set forth the reasons for the conclusions reached.

### I. *Preliminary Analysis of § 211(h)*

The Rail Act contemplates that the bankrupt estates will be responsible for, and have the benefit of, all rail operations until midnight of March 31, 1976, and that Conrail will have these responsibilities and benefits from that time forward. The primary objective of § 211(h) is to insure that no unpaid pre-conveyance obligations of the debtor estates will hamper Conrail's ability to provide uninterrupted rail service.

Many of the costs attributable to pre-conveyance operations will be billed and payable after conveyance, and many of the offsetting revenues will be billed and receivable after conveyance. As of the conveyance date, Conrail will be the owner of all materials and supplies on hand, as well as all of the other rail assets, but will not have paid for them. Moreover, and of immediate practical importance, Conrail will own the facilities and control the personnel needed to handle the myriad details involved in the processing of payments and collections.

In essence, § 211(h) contemplates that Conrail, as agent for the Debtor, will collect the accounts receivable and pay the accounts payable which are attributable to pre-conveyance operations. With respect to obligations which, in the joint judgment of USRA and Conrail, must be paid in order to insure uninterrupted rail service, Conrail is expected to cause payment to be made, and is entitled to obtain reimbursement from the Debtor's estate. If necessary, Conrail is

authorized to borrow money from USRA in order to pay certain kinds (but not all) of the obligations in this category. With respect to payments on behalf of the Debtor's estate which are made by Conrail from its own funds or from funds borrowed from USRA, its claim for reimbursement from the Debtor's estate constitutes a high priority, interest-bearing, administration claim.

At the present stage, the Reorganization Court is required to enter two kinds of orders: (1) an order under § 211(h)(2) governing the terms of the agency agreement between the Debtor's estate and Conrail; and (2) an order under § 211(h)(3) specifying the "cash and other current assets" of the Debtor's estate, now on hand or to be received in the future, which are to be made available for payment of "the obligations of the estates identified in paragraph 1 of this subsection."

These two sets of requirements are interrelated, since the Agency Agreement must specify what payables and receivables are to be "processed" by Conrail, and since the designation of cash and current assets must be "consistent with the principles of reorganization under § 77 of the Bankruptcy Act (11 U.S.C. § 205) and with the agency agreement . . . ." (§ 211(h)(3)(B))

At the outset, it is important to note certain asymmetrical features of the statute. The Agency Agreement may (and, as a practical matter, must) embrace obligations in many categories, and not just obligations the non-payment of which might embarrass Conrail's operations. Moreover, there are many kinds of obligations which must be paid in the interest of uninterrupted rail service, but which are not eligible for funding by USRA under § 211(h)(1). For example, (h)(1) funding is available for payroll expenses only with respect to employees covered by collective bargaining agreements; substantial post-conveyance expenditures for pre-conveyance payroll for non-agreement personnel, and for payroll taxes, must be met from sources other than (h)(1) borrowings.

## II. Accounts to be Processed under the Agency Agreement

The Agency Agreement, the terms of which are to be prescribed by this Court in the absence of agreement between the parties, is, according to the provisions of § 211(h)(2) of the Rail Act, to provide "for the processing of all accounts receivable and accounts payable attributable to operations prior to the conveyance of property pursuant to § 303(b)(1) of this Act." It seems clear that the word "operations" in this context refers to rail operations, and that the Agency Agreement should not impose upon Conrail any duties or obligations with respect to the non-rail properties retained by the Trustees after conveyance. It is also clear that, as mentioned above, the rail-related accounts to be processed by Conrail under the Agency Agreement should include all such accounts, and not merely accounts in categories eligible for § 211(h)(1) loans from USRA.

The Trustees have set forth, in their proposed Appendix "A" and Appendix "C," the appropriate accounts receivable and payable which should be processed by Conrail under the Agency Agreement.

## III. Designation of "Cash and Other Current Assets" Pursuant to § 211(h)(3)

Section 211(h)(3) requires the Court to enter an order which:

"(A) identifies that cash and other current assets of the estate of such railroad which shall be utilized to satisfy obligations of the estates identified in paragraph (1) of this subsection; and

"(B) provides for the application by the trustees of such railroads and their agents, consistent with the principles of reorganization under § 77 of the Bankruptcy Act (11 U.S.C. § 205) and with the agency agreement specified in paragraph (2) of this subsection, of all such current assets, including cash available as of or subsequent to such date of conveyance, to the payment in the postconveyance period of the obligations of the estates identified in paragraph (1) of this subsection."

The first problem of interpretation is to determine what is meant by "obligations of the estates identified in paragraph 1." Section 211(h)(1), to which reference is made, does not actually "identify" any obligations. It begins by authorizing USRA

" . . . to enter into loan agreements, in amounts not to exceed $230,000,000 in the aggregate, with [Conrail] . . . under which [Conrail] will agree to meet existing or prospective obligations of the railroads in reorganization in the region which [USRA] . . . determines should be paid by [Conrail] in order to avoid disruptions in ordinary business relationships."

The statute then further provides:

"Such obligations shall be limited to amounts claimed by suppliers (including private car lines) of materials or services utilized in current rail operations, claims by shippers arising from current rail services, payments to railroads for settlement of current interline accounts, claims of employees arising under the collective bargaining agreements of the railroads . . ., claims of all employees or their personal representatives for personal injuries or deaths and subject to the provisions of the Employer's Liability Acts . . . and amounts required for adequate funding of accrued pension benefits existing at the time of a conveyance or discontinuance of service * * * The Association shall not make such a loan unless it first finds * * *

"(A) provision for the payment of such obligations was not included in the financial projections of the final system plan;

"(B) such obligations arose from rail operations prior to the date of conveyance . . . and are, under other applicable law, the responsibility of a railroad in reorganization in the region;

"(C) [Conrail concludes payment is necessary to avoid disruptions in ordinary business relationships].

"(D) the transferor is unable to pay such obligations within a reasonable period of time; and

"(E) [provisions for repayment of the loan have been approved by Conrail and the Finance Committee]."

In short, § 211(h)(1) speaks in terms of loan agreements which may properly be made between USRA and Conrail, and provides that certain kinds of obligations may, subject to specified limitations, be satisfied through the use of § 211 funds. Since only USRA and Conrail can determine what obligations "should be paid by Conrail in order to avoid disruptions in ordinary business relationships," it is apparent that this Court simply could not comply with the requirements of § 211(h)(3)(A), if interpreted as contemplating some correlation between the amount of cash identified by the Court and the amount of (h)(1) obligations.

█ Reading Subsections (A) and (B) of § 211(h)(3) together, it appears probable that what the Court is expected to do is to specify the "cash and other current assets" which may properly be used for the payment of the kinds of obligations categorized in Subsection (h)(1) as being potentially eligible for (h)(1) financing. This determination must be made without reference to the actual arrangements which may be worked out between USRA and Conrail.

█ The next question is the correct interpretation of the term "cash and other current assets of the estate of such railroad." In the absence of any other criterion, and particularly in view of the requirement that the Court's order be "consistent with the principles of reorganization under § 77 of the Bankruptcy Act," I conclude that this means cash and all other items considered to be "current assets" in the ICC system of accounts, namely, ICC accounts Nos. 701 to and including 713. For obvious reasons, it does not include capital assets such as those embraced under ICC account No. 716.

█ The parties have devoted a great deal of attention to debating whether or not the Trustees can lawfully be required to invade escrow funds and other liened assets in order to pay immediately the kinds of

administration claims in the categories eligible for § 211(h)(1) funding, in view of the teachings of *Central R.R. Co. of N. J. v. Manufacturers Hanover Trust Co.,* 421 F.2d 604 (3d Cir. 1970); *In the Matter of Penn Central Trans. Co., Debtor ["Columbus Option"],* 494 F.2d 270 (3d Cir.), *cert. denied,* 419 U.S. 883, 95 S.Ct. 147, 42 L.Ed.2d 122 (1974), and the recent decision of the Third Circuit in *In re Penn Central Trans. Co. ["Section 215 Appeals"],* 533 F.2d 1347 (3d Cir. 1976). In my judgment, these arguments have no place in the present case. I fail to see how escrow accounts which are either deposited pending resolution of disputes as to ownership and entitlement thereto, or subject to liens, or both, can reasonably be deemed "cash and other current assets" of the Debtor's estate within the meaning of § 211(h)(3).

It seems to be the position of USRA and Conrail that § 211(h)(3) makes it mandatory for the Reorganization Court to make available, from the Debtor's estate, enough money to satisfy all of the obligations of the Debtor's estate in the categories eligible for funding under (h)(1). If that assumption were sound, then (a) it would be necessary to determine whether this is legally permissible in view of the cases cited above, and (b) the § 211(h)(1) loan program would be virtually unnecessary. Under that approach, it would presumably be argued that the Court could require the Trustees to sell liened property in order to raise money to defray (h)(1) obligations.

To me it seems quite clear that § 211(h) is designed to insure that unpaid pre-conveyance obligations of the Trustees attributable to rail operations are not to cause interference with Conrail's operations. Congress plainly recognized that the Trustees might lack the ready resources to accomplish that worthy objective. Accordingly, Congress authorized Conrail to make whatever payments of the Trustees' obligations may be necessary to prevent interference with Conrail's operations, provided loan funds which might be used for that purpose, assured Conrail that, within three years, it would either be reimbursed for, or

exonerated from, such payments and provided for high-priority administration claims against the Debtor's estate for the benefit of Conrail or USRA, as appropriate, in the amount of the shortfall between the Trustees' ability to pay and the amount of the obligations necessary to be paid. Section 211(h)(3) is clearly designed to identify the available resources of the Trustees, and thus provide a basis for financial planning in administering the (h)(1) loan program. Obviously, if Congress had intended to impose a requirement that the Trustees immediately raise the money § 211(h)(3) would have been worded quite differently.

The short answer to USRA's contentions is that, to the extent the Trustees have a present interest in the escrow funds reflected in ICC account No. 716, these are capital assets, not current assets. Moreover, as a practical matter, these funds are simply not available to the Trustees, or even potentially available, within the meaning of § 211(h)(3). The supplemental affidavit of Ernest R. Varalli, and the testimony of Messrs. Varalli and Hull at the hearing, convincingly establish that USRA and Conrail are patently in error in assuming that account No. 716 contains $134 million available to the Trustees. As noted above, many of these escrow accounts contain funds, the ownership of which has yet to be established. All are subject to various liens. And none are within the actual control of the Trustees; the entities with whom these escrow funds are deposited could be expected to resist vigorously, and at length, any effort to make these funds available for use in defraying (h)(1) obligations.

Moreover, the time frame established by Congress for the order to be entered under § 211(h)(3) is itself a cogent reason for rejecting USRA's approach. Interestingly enough, while USRA and Conrail ask the Court to order the use of escrow funds to satisfy (h)(1) obligations, the executive branch of government takes a contrary position, with respect to the $15 million fund which forms a part of the $50 million escrow fund established pursuant to Order

No. 2158 in connection with the defaulted trustees' certificates. The executive branch argues that the *Columbus Options* case, *supra,* precludes such use of these funds, and insists that the defaulted certificates should now be made good. It is simply inconceivable that Congress could have intended all of these issues to be resolved by March 31, 1976, or within any other time frame sufficiently brief to make the determinations useful for planning and administering the § 211(h)(1) loan program.

In effect, adoption of the URSA approach would convert a § 211(h)(3) order into a partial reorganization plan for the Debtor's estate. I am satisfied that Congress did not intend to require the reorganization courts to embark upon a task of that magnitude at this juncture. Moreover, any attempt to do so would render formulation of an eventual reorganization plan almost infinitely more complicated and difficult.

This is not to say that administration claims do not need to be dealt with. Obviously, the Trustees are faced with exceedingly difficult and pressing problems in that regard. But the essential approach of § 211(h) is simply to insure that what can be done immediately will be done immediately to prevent potential interference with Conrail's operations, and to provide amply-secured loan funding to protect Conrail from such interference.

For all of the foregoing reasons, I have concluded that the term "cash and other current assets" means what it says, and that those accounts treated as "current assets" under the ICC system of accounts fulfill that definition (*i. e.,* accounts Nos. 701 through 713, but not No. 716).

## IV. *Vacation Pay*

A principal subject of dispute is whether the Trustees should be required to reimburse Conrail an amount of money equal to the amount which will be paid to Conrail's employees, formerly employed by Penn Central, during their vacation periods in 1976. Generally speaking, employees of the Debtor become entitled to paid vaca-

tions in a given year by having worked a specified number of days during the preceding year. Although eligibility for 1976 vacations will have become vested as of the conveyance date, by virtue of employment during 1975, no employee will be entitled actually to receive a paid vacation until after the conveyance date.

The Debtor, like most corporations, employs the accrual method of accounting. Accordingly, as of the conveyance date, the Debtor's books will reflect an accrued liability of approximately $70 million, representing the estimated amount to be paid to employees during vacation periods in 1976. If the Debtor had continued in operation, these employees would have been paid their regular payroll during the 1976 year, and the Debtor would have accrued a further liability for vacation pay for the ensuing year. The actual payment of payroll expenses would have been made from current operating revenues.

In many contexts, it is customary to treat vacation benefits as a form of additional compensation for services performed during the eligibility period. Thus, for purposes of determining the wage priority under § 64(a)(2) of the Bankruptcy Act for "wages . . . which have been earned within three months before the date of the commencement of the proceedings . . . .", courts frequently refer to vacation benefits as having been "earned" during the qualifying period, although not actually payable until later. *See, e. g., L. O. Koven & Bros., Inc. v. Local Union No. 5767, United Steelworkers,* 381 F.2d 196, 205 (3d Cir. 1967); *U. S. v. Munro-Van Helms Co.,* 243 F.2d 10, 13 (5th Cir. 1957). *See also* 3 Collier on Bankruptcy (14th ed.) ¶ 64.203, p. 2112.

To state that an employee "earns" his 1976 paid vacation by services performed in 1975 does not necessarily mean that *all* of the benefits flowing to the employer, in exchange for which the paid vacation is given, are attributable to the earlier year. Implementation of a paid vacation policy produces benefits to the employer during

the vacation year as well. Employees who are physically and mentally refreshed are likely to be more efficient. The policy of providing longer vacations for employees with seniority tends to assure a stable labor force, and to provide the employer with desirable levels of experienced workers. In short, the wage priority cases cited above stand essentially for the proposition that an employer who has made it impossible to garner all of the benefits for which paid vacations are granted may not assert such impossibility to defeat or diminish claims for vacation benefits founded upon eligibility through prior service.

Thus, cases involving cessation of operations after accrual of vacation benefits do not necessarily provide guidance for cases, such as the present, where business operations will be continued under new ownership. Of course, in the case of voluntary acquisition of a going business, the parties are free to make whatever arrangements they see fit for the appropriate adjustments for accrued vacation pay liabilities. *See, e. g., H. K. Porter Co. v. Wire Rope Corp.,* 367 F.2d 653 (8th Cir. 1966). The conveyance from Penn Central to Conrail is mandated by statute, and is not voluntary on the part of either the transferor or the transferee. The desires of the respective parties are immaterial. The task of the Court is to attempt to ascertain the Congressional intent on this subject.

It would have been helpful if Congress had inserted a provision specifically listing the appropriate breakdown of liabilities as between Penn Central and Conrail. There are, of course, many provisions in the statute which bear upon the general subject, but all of these provisions seem couched in terms which would be appropriate for entities employing a cash system of accounting, rather than the accrual method. Nevertheless, it must be assumed that Congress was aware that both the Debtor and Conrail

would employ the ICC system of accounts, and that the Final System Plan financial projections are based upon computer models formulated in accordance with accrual accounting methods.[1]

The Rail Act clearly directs and requires that Conrail assume, and relieve the Debtor of, certain liabilities shown as accrued liabilities on the books of the Debtor as of conveyance date. For example, a wide range of liabilities for rolling stock are governed by the provisions of § 303(b)(3)(A)(i).

Of particular pertinence to the present problem are the provisions for protecting the interests of employees, §§ 504, 505 and 509. In each instance, great care is taken to insure that Conrail itself will be responsible for according to such employees at least the same protections the Debtor would have been obliged to afford had it continued in business. Indeed, it can be argued that the obligations of Conrail are considerably greater than the obligations the Debtor would have had.

By way of background, it should be borne in mind that, throughout the reorganization proceedings, the Trustees have not actually affirmed, adopted, or executed, any collective bargaining agreements. However, in recognition of the fact that collective bargaining agreements are negotiated on a nationwide basis, and of the fact that § 77 does not permit the Trustees or the Court to alter the terms or conditions of employment except pursuant to the Railway Labor Act, the Trustees have in each instance sought and obtained permission of this Court for leave to comply with the provisions embodied in collective bargaining agreements which were negotiated for the railway industry generally. *See, e. g.,* Orders Nos. 210, 1324, 1827 and 2148. The purpose of these arrangements, as distinguished from actual affirmance or adoption of the agreements themselves, was to leave open various issues concerning the extent of

---

1. Compare, however, the language of § 211(h)(4)(A)(ii):

"... such obligation accrues after such date of conveyance but as a result of rail operations conducted prior to such date ...".

further liability in the event of cessation of rail operations by the Debtor. Understandably enough, the Rail Act does not leave open any of these issues, insofar as Conrail is concerned.

Section 505 contains elaborate provisions for job protection, transfer allowances, moving expenses, termination allowances, etc. Section 509 provides that Conrail "shall be responsible for the actual payment of all allowances, expenses, and costs provided employees pursuant to the provisions of this title," and authorizes it to obtain reimbursement, not exceeding $250 million in amount, from the Railroad Retirement Board. The same section provides for an equivalent appropriation to the Railroad Retirement Board for that purpose.

Section 504(a) provides that Conrail "shall, as though an original party thereto, assume and apply on the particular lines, properties or facilities acquired all obligations under existing collective bargaining agreements . . . ". This section contains no provision for reimbursement to Conrail from any source.

Section 504(e) deals with claims arising under collective bargaining agreements which are subject to § 3 of the Railway Labor Act. It makes clear that the debtors are to be responsible for paying claims which were "sustained or settled prior to such date of conveyance," but that Conrail "shall assume responsibility for the processing of any such claims, and payment of those claims which are sustained or settled on or subsequent to the date of conveyance . . . and shall be entitled to direct reimbursement from the Association pursuant to § 211(h) of this Act."

Section 504(g) contains similar provisions with respect to FELA claims. There, the language is

"All cases or claims by employees or their personal representatives for personal injuries or death against a railroad in reorganization in the region arising prior to the date of conveyance of rail properties, pursuant to § 303 of this Act, shall be assumed by [Conrail] . . . [Conrail] shall process and pay any such claims that are sustained or settled, and shall be entitled to direct reimbursement from the Association pursuant to § 211(h) of this Act."

It is clear that the vacation pay claims now under discussion fall within the purview of § 504(a). That section unambiguously provides that Conrail "shall, as though an original party thereto, assume and apply . . . all obligations under existing collective-bargaining agreements . . . ". and makes no mention of reimbursement under § 211(h) or any other section of the statute.

An argument can be made that, even with respect to FELA claims and arbitrable claims under § 504(e), the ultimate liability is Conrail's, and that Congress believed that funds would be available under § 211(h) to enable Conrail to meet its obligations.

To some extent, the language of § 211(h)(1) bears out this interpretation. The pertinent language is

" . . . the Association shall not make such a loan unless it first finds that the loan is for the purpose of paying obligations with respect to accrued pension plans referred to in the preceding sentence or that [Conrail] is entitled to a loan pursuant to subsections (e) and (g) of Section 504 of this Act, or unless it first finds that [inter alia] such obligations are, under other applicable law, the responsibility of a railroad in reorganization in the region."

In other words, the quoted portions of § 211(h)(1) seem to contemplate loans to Conrail for § 504(e) and § 504(g) purposes irrespective of whether or not they are the responsibility of the bankrupts.

If, as USRA and Conrail contend, § 211(h)(1) funds are available only for obligations which are the ultimate responsibility of the bankrupts, the specific references to §§ 504(e) and 504(g) do not make much sense. On the other hand, the basic starting point of § 211(h)(1) is "existing or prospective obligations of the railroads in reorganization in the region." This bolsters the

contention of USRA and Conrail that the only permissible use of § 211(h)(1) funds is to satisfy obligations of the Debtor, and not to make it possible for Conrail to meet its own obligations, imposed under § 504(e) or (g). It is difficult to avoid the conclusion that the "direct reimbursement" language of the latter section simply cannot be totally reconciled with the actual provisions of § 211(h)(1). In view of the nature of the claims which might arise under §§ 504(e) and 504(g) (arbitration awards and FELA claims), a construction of the statute which places ultimate responsibility upon the Debtor for the pre-conveyance period seems reasonable; this view is apparently shared by all of the parties.

It is important to note the use of the words "existing or prospective obligations of the railroads in reorganization" in § 211(h)(1). Surely, if Congress had intended the principles of accrual accounting to be controlling in all respects, this language would not have been used.

It is also important to bear in mind that implementation of the Rail Act during the pre-conveyance period has ignored the requirements of accrual accounting. It would never have occurred to anyone to suggest that the Trustees were being, or could be, asked to defer $70 million in payroll expenses, or to borrow money in order to meet payroll. Yet the position now being taken by USRA and Conrail would require a *nunc pro tunc* determination to that effect.

It is clear to me that §§ 213, 215 and 211(h) of the Rail Act are intended to deal with cash flow problems. Indeed, USRA's briefs in the present proceeding emphasize that § 211(h) is not intended to deal with a final accounting as between the Debtor and Conrail. It would be disruptive of the statutory scheme to interpret these provisions inconsistently. The clear cash flow approach of these statutory provisions should not be ignored in the interests of applying woodenly the principles of accrual accounting.

Thus, even if I am in error in concluding that the ultimate responsibility for pay during 1975 and subsequent vacation periods rests with Conrail, rather than with the Trustees, it would not follow that immediate payment to Conrail in cash was intended by Congress. Everyone recognizes that Conrail is expected to meet its own payroll from and after conveyance. Whether a portion of its payroll expenses is chargeable to one year or another will not affect its cash flow.

At the hearing in this matter, and in their briefs, the parties have devoted considerable effort to the question of whether or not the financial projections in the Final System Plan contemplate absorption of this item by Conrail. The evidence on this subject is indeed confusing. It appears probable that, from the standpoint of the balance sheet and profit and loss statements, the Final System Plan assumes that Conrail will commence operations without an accrued liability for vacation pay. It is also reasonably clear that the unit costs upon which various financial projections were based included all actual payroll expenditures. Since no cash flow projections have ever been developed for Conrail, it is impossible to tell whether Conrail's operating cash requirements were calculated on the assumption that Conrail would be receiving $70 million in cash from the Trustees during the immediate post-conveyance period. The absence of evidence on this subject would seem to suggest a negative answer to the latter question.

Be that as it may, the inclusion or exclusion of vacation pay liabilities in the FSP financial projections is an issue which (a) is for USRA, not this Court, to determine; and (b) affects only the question of eligibility for (h)(1) loans, a matter which, again, is not within the province of this Court. Conversely, the FSP was obviously not intended to re-define legal liabilities. At most, then, the provisions of the FSP on this issue would be relevant only to the extent that they might shed light upon Congressional intent. I do not believe it can fairly be said that they do so on this issue.

As discussed above, I believe Congress intended to make sure that no employee

should run the risk of having to assert an administration claim against the Debtor's estate for the enforcement of rights assured under the terms of collective bargaining agreements. Conrail simply cannot comply with the requirements of § 504(a) except by paying the wages of employees from and after conveyance date, during vacation periods as well as other periods. Contrary to the arguments of USRA and Conrail, I believe there is a clear distinction between payroll covering the post-conveyance period, and payroll for the pre-conveyance period which remains unpaid on conveyance date.

And finally, it should be noted that, if the contentions of USRA and Conrail were accepted, and the Debtor were forced to pay Conrail $70 million, the § 211(h)(1) loan program would be utterly inadequate, and potentially disruptive claims could not be satisfied. Here again, it seems clear that Congress could not have intended such a result.

For all the foregoing reasons, I have concluded that the pay of employees during post-conveyance vacation periods is not an obligation of the estate of the Debtor, and that, in any event, it is not within the scope of § 211(h).

## V. Compensation for Conrail's Services as Agent

The Rail Act is silent on the subject of whether Conrail is to receive compensation from the bankrupt estates for serving as their agent during the post-conveyance period. The legislative history is unenlightening. The final 1975 Conference Report (Report of the Committee of Conference on S2718, S.Rep.No.94–585, p. 64 (Dec. 18, 1975)) contained a provision authorizing Conrail to recover its direct costs associated with recovering from the bankrupt estates the amount of § 211(h)(1) loans. However, the bill was later amended before submission to the President, and this language was deleted.

There are some fleeting references in the comments and the discussion contained in the Final System Plan which can be interpreted as suggesting that USRA assumed that Conrail would be compensated for its services as agent. But the FSP is essentially silent upon this issue (owing in part to the absence of cash flow projections for Conrail, and the generally theoretical, computer-simulated, nature of the projections in the FSP). Indeed, in the present proceeding, USRA itself has remained neutral on this issue.

■ In the absence of any statutory or FSP guidance, I believe the following considerations should control: To require Conrail to meet its own payroll and overhead expenses for the purpose of enabling its employees to handle the Debtor's accounts *gratis* simply does not seem equitable. In the absence of any clear indication in the statute, I am reluctant to impute that intent to Congress. Moreover, the whole purpose of the Rail Act is to preserve and improve rail service. No one familiar with the history of the Rail Act and its implementation can seriously suggest that Congress intended to give the bankrupt estates a free ride at Conrail's expense, during the immediate post-conveyance period in which Conrail would have virtually no operating revenues of its own.

Accordingly, I have concluded that payment, in some amount, must be made by the Trustees to Conrail. There are various possible theories by which this compensation might be determined. If this were a totally arms-length and voluntary arrangement, one would expect a level of compensation which would cover fully-allocated costs plus some return on investment, but with some downward adjustment to reflect the fact that it is to Conrail's advantage to have control over the handling of the accounts. On the other hand, in that case the Trustees would be free to reject Conrail's services, and to perform the work with their own employees, in which event only the actual costs would be incurred.

The negotiations of the parties have been based upon certain practical considerations. The agency arrangement contemplates

that, to a large extent, the same employees who handled these accounts for Penn Central will continue to process them for Conrail as agent for Penn Central. For varying lengths of time, depending upon the nature of each account, if these employees were not processing the Debtor's accounts under the agency agreement, they would have no work to do. In theory, if they were not working on Penn Central's accounts, they could be furloughed, in which case Conrail would avoid some payroll costs, but would not be receiving return on investment or appreciable reduction in overhead expense. Each party has advanced a settlement proposal which would require Conrail to provide certain services without reimbursement for a limited period, and to provide all services at cost thereafter.

There are three kinds of services involved: (1) "outside" services performed by others under contract (e. g., attorneys to defend FELA cases, etc.); (2) "extra" accounting services involved in closing out the books of the Debtor as of conveyance date, and reconciling the Debtor's accounts with the perhaps somewhat different accounting methods to be employed by Conrail (these services are outlined in proposed Appendix "G" to the draft of the Agency Agreement); and (3) ordinary services to be performed by Conrail employees. Conrail's proposal is that it be reimbursed the costs involved in the first two categories from and after conveyance date, and in the third category commencing 30 days after conveyance. Since no agreement with Conrail is possible on any other basis, and since the record does not furnish enough information to justify the Court in imposing upon Conrail more onerous terms, I have concluded that the parties should proceed in accordance with Conrail's proposal. To the extent that this arrangement works out to the disadvantage of either party, each is free to seek adjustments in the Special Court proceedings. All that this Court is deciding is that the Conrail proposal appears to be a not unreasonable method of handling matters from a cash-flow standpoint, which, as noted above, is the immediate concern under § 211(h).

## VI. *Trustees' Expenses*

■ The Trustees seek complete assurance that there will be made available to them adequate funds to support their continuing reorganization efforts, including management of the Debtor's retained assets and litigation expenses. They estimate that some $58 million will be required for these purposes over a three-year period, and request that the entire sum be set aside initially. It is understandable that there should be a great deal of confusion about the correct disposition of this request. Until the designations under (h)(3) were made, it was difficult to tell how much would be required from the receivables administered under the Agency Agreement. Moreover, until the books are closed as of conveyance date, a great many other uncertainties will persist. It is quite clear, therefore, that the amount to be set aside under the Agency Agreement must be re-evaluated from time to time, in light of actual events.

All parties are in accord that these continuing reorganization expenses take priority over everything else, and there is also general agreement that it is desirable, from the standpoint of employee morale and retention of qualified staff (of both the Trustees and the many subsidiary business enterprises) to make sure that the financial needs for the continued functioning of the Debtor's estate will be met. At the time of the hearing, there was some uncertainty in the record as to the amount of cash and short-term cash investments which would be subject to the Agency Agreement pursuant to Trustees' Appendix "A." There was also some uncertainty as to the potential availability of a significant dividend from the Canada Southern Railway Company. I concluded that, under all of the circumstances, the cash, temporary cash investments, Canada Southern dividend, and $20 million from receivables would represent an appropriate total to be set aside for the

Trustees at this point, subject to later revision as the circumstances may warrant.

## VII. *Disbursements by Conrail as Agent*

The Trustees have contended that, from the receivables collected by Conrail under the Agency Agreement and deposited in the "segregated account," after recognition of certain priority items, the accounts payable which are not eligible for (h)(1) loan funding should be paid first. Under this view, all of the administration claims attributable to pre-conveyance rail operations would probably be paid currently, if the $230 million ceiling on (h)(1) loans were to be increased as needed. If the Court were empowered to require that all pre-conveyance claimants be treated equally, this approach would have much to recommend it. But I do not believe it can be reconciled with the scheme of § 211(h). Since the clear purpose of § 211(h) is to make sure that Conrail's operations are not embarrassed by unpaid bills of Penn Central, and since there is not enough money to go around, the conclusion is inescapable that Congress intended to have potentially-disruptive claims paid first.

I recognize a certain inconsistency in the statutory approach. For some unexplained reason, perhaps inadvertence, some kinds of potentially-disruptive claims (*e. g.,* payroll and payroll taxes for non-agreement employees) are not eligible for (h)(1) loan funding. But it is not within the province of this Court either to amend the statute or to question the adequacy of the loan program.

It is clear that, to the extent that Conrail collects interline payments which the Court of Appeals has determined constitute trust funds, *see In re Penn Central Trans. Co.,* 486 F.2d 519 (3d Cir. 1973), *cert. denied,* 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974), Conrail must treat them as trust funds, and pay them over to the proper parties. As for the balance of the segregated account, after the amount set aside for the Trustees' expenses, it is agreed that all unpaid payroll and payroll taxes attributable to the pre-conveyance period, whether eligible for (h)(1) loans or not, must be paid. It is also clear that Conrail should be authorized to satisfy other obligations which pose a threat to continued rail service. The extent to which non-trust fund current interline balances fall within that category is a matter for USRA and Conrail to decide.

At the present time, it seems premature to make any final determination as to whether, and to what extent, the segregated funds should be devoted to obligations not eligible for (h)(1) loan funding. Accordingly, Order No. 2297 provides for a review of the situation after 60 days (or earlier, if necessary).

Pursuant to the suggestions of USRA and Conrail, and in the absence of any objection, the Order relieves Conrail of the necessity of settling interline accounts as between railroads in reorganization which are now part of Conrail. At present writing, I do not know whether this provision is consistent with the provisions of the § 211 orders entered by other reorganization courts. If appropriate, applications for reconsideration will be entertained.

## CONCLUSION

Order No. 2297 contemplates that the parties will prepare and submit a draft Agency Agreement in conformity with the conclusions appended to the Order, and discussed herein; and that they may present, if they deem it necessary, a more detailed and complete form of Order for entry by the Court.

## ORDER NO. 2297.

AND NOW, this 31st day of March, 1976, pursuant to §§ 211(h)(2) and 211(h)(3) of the Regional Rail Reorganization Act of 1973, as amended by the Railroad Revitalization and Regulatory Reform Act of 1976, 45 U.S.C. §§ 721(h)(2) and 721(h)(3), it is ORDERED:

That the Agency Agreement between the Trustees and Conrail shall contain provisions, and cash and other current assets

shall be deemed available, in conformity with the conclusions annexed hereto.

## CONCLUSIONS

With respect to the issues submitted to this Court for decision pursuant to §§ 211(h)(2) and 211(h)(3) of the Rail Act, the Court has reached the following conclusions:

1. In accordance with the provisions of § 211(h)(2), the agency agreement should embody the distinctions between rail and non-rail accounts as set forth in the Trustees' proposed Appendices "A" and "C." Said Appendices are therefore approved.

2. The terms proposed by Conrail for settlement of the compensation issues should be accepted, without prejudice to the right of any party to contend before the Special Court that this resolution of the issue produces further erosion or other claimed detriments, or other benefits.

3. The amount to be set aside for the Trustees' operating expenses should include (a) cash and temporary cash investments (ICC Accounts Nos. 701 and 702) (to be supplied directly by the Trustees, if not included in Appendix "A"), (b) the Canada Southern dividend when received, and (c) the sum of $20 million from receivables collected by Conrail pursuant to the agency agreement. The amount thus set aside shall be subject to periodic review and adjustment if necessary.

4. For purposes of § 211(h)(3), the term "cash and other current assets" includes only those items treated as "current assets" under the ICC system of accounts. Specifically, this includes ICC Accounts Nos. 701 through 713. It does not include capital accounts, and specifically does not include Account No. 716.

5. Compensation to employees during vacation periods after conveyance date are the responsibility of. Conrail, not of the Debtor's estate. Funds in the segregated account should not be used to reimburse Conrail for any such payment. The parties are free to pursue before the Special Court their respective contentions as to whether or not this disposition of the matter results in "other benefits" for valuation purposes.

6. With respect to materials and other inventory on hand as of conveyance date but not yet paid for, the position of Conrail is correct.

7. The remaining issues presented by Trustees' proposed Appendix "F" are reserved for later decision pending further negotiations and possibly further proceedings.

8. The issues presented by proposed Appendix "B" and "D" are likewise reserved for decision pending further negotiations or further proceedings.

9. At least initially, this Court should retain jurisdiction to resolve disputes. Depending upon the nature and extent of disputes which may arise, some other mechanism for resolution may later be decided upon.

10. In making disbursements from the segregated account, Conrail should treat as trust funds those elements of the current interline accounts determined to constitute trust funds in the decision of the Court of Appeals for the Third Circuit in *In re Penn Central Transportation Co.,* 486 F.2d 519 (3d Cir. 1973), *cert. denied* 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974). Current interline obligations between railroads in reorganization may be disregarded. After setting aside the appropriate amount for Trustees' expenses, funds in the segregated account may be disbursed for pre-conveyance payroll of both agreement and non-agreement personnel, and payroll taxes attributable to the pre-conveyance period. During the first 60 days of operation under the agency agreement, Conrail need not make disbursements from the segregated account for the satisfaction of obligations, the non-payment of which would not pose a threat to continued business relationships or otherwise interfere with continuation of rail service. At the end of the 60-day period, the situation will be reviewed by the Court, and further appropriate determinations made. If a more specific ruling is

required in the interim, any party may apply for clarification or further instructions.