### In re COLUMBIA PACKING COMPANY, Debtor.

Bankruptcy No. 83–00260–HL.

United States Bankruptcy Court, D. Massachusetts.

June 9, 1983.

Whitton E. Norris, III, Peabody & Brown, Boston, Mass., for debtor.

Nathan S. Paven, Quincy, Mass., for Local 592.

ORDER ON MOTIONS FOR AUTHORITY TO TURN OVER PRE–PETITION EMPLOYER PAYROLL DEDUCTION, TO GRANT VACATION PAY EARNED PRIOR TO THE FILING OF THE CHAPTER 11 PETITION, TO PAY FEBRUARY, 1983 EMPLOYER CONTRIBUTION TO UFCW LOCAL 592 HEALTH AND WELFARE PLAN, AND TO PAY PRE–PETITION EXPENSES OF SALESPEOPLE

HAROLD LAVIEN, Bankruptcy Judge.

Columbia Packing Company, ("Columbia") is a debtor in possession under Chapter 11 of the Bankruptcy Code. Columbia filed its voluntary Chapter 11 petition on February 28, 1983. The debtor in possession ("debtor") has filed a series of motions requesting authority to make certain pre-petition payments. This Order will cover each motion.

## MOTION FOR AUTHORITY TO TURN OVER PRE–PETITION PAYROLL DEDUCTIONS

Prior to the filing of the Chapter 11 petition, the debtor had deducted amounts from the wages of its employees for union dues, employee contributions to a pension plan for all salaried employees, and/or employee deposits to the Social Services Credit Union ("credit union"). The payroll deductions were made in accordance with check-off provisions in either of the two pre-petition union contracts. These provisions provide for such payroll deductions to be made upon written request of the employee. The debtor represented that for non-union employees, the deductions were also made pursuant to written requests.

The debtor seeks to make the following payments:

1. $2,453 for union dues for the month of February, 1983.

2. $5,790 to the credit union for payroll deductions made during the week immediately prior to the filing of the Chapter 11 petition.

3. $3,681.70 for employee contributions to a pension plan. These deductions for January and February of 1983 were not due to the pension trustee until March, 1983 since the debtor's practice was to turn them over on a quarterly basis.

All of the above deductions were made from the respective employee's gross wages during the month of January and/or February, 1983. Therefore, all the deductions were made from wages earned within 90 days of the filing.

Section 507(a)(3) of the Code creates a third priority for "unsecured claims for wages ... earned by an individual within 90 days of the filing ... to the extent of $2,000." Since these were payments out of gross wages, the debtor will be permitted to make these payments up to the balance remaining of the $2,000 per employee under § 507(a)(3) not already consumed in payment of wages or other benefits. No employee may exceed the $2,000 limit.

In its memorandum, the debtor asserts that to the extent it can trace these funds into its general cash account, the funds were not property of the estate and therefore, the payments are not limited by the $2,000 priority. The debtor argues that it can make a general tracing of the funds as follows:

Prior to the filing of its Chapter 11 petition, the Debtor maintained a general cash account with the State Street Bank and Trust Company. When a payroll was to be met, the Debtor would customarily transfer funds from its general cash account to a payroll account with the same Bank, and only net payroll checks would be issued from the payroll account. Since the funds transferred to the payroll account represented net payroll, after withholdings for federal and state income taxes on gross wages, and then after deductions as described above, the Debtor held the amounts deducted from the pay of its employees in its general cash account. On January 20, 1983, however, the Debtor's general cash account had a negative balance. At all times thereafter, up to the filing of its Chapter 11

petition, the Debtor maintained funds in its general cash account in excess of the amounts to be paid as payroll deductions. All payroll deductions discussed herein were deducted from employee wages after January 20, 1983, except for $1,761.95 which had been deducted from employee wages on or before January 20, 1983, on account of January's employee contributions to the Debtor's salaried pension plan. Debtor's memorandum, at 5.

The funds the debtor claims it can trace are in the general cash account. The checkoff provision of the union contracts did not require that a separate fund be created nor was a separate fund created. *See In re T.B.G. Corp.*, 3 B.C.D. 1398 (Bkrtcy.S.D.Oh. 1977). Clearly, the general cash account is property of the estate. No separate trust fund was created for these employee payroll deductions. Therefore, all payments which are made pursuant to this order and the other orders allowing priority payment to employees cannot exceed $2,000 per employee.

### MOTION TO GRANT VACATION PAY EARNED PRIOR TO THE FILING OF THE CHAPTER 11 PETITION

■ The debtor is seeking authority to grant all of its employees their full paid vacation time earned during the calendar year 1983. All employees become eligible for a one week vacation with pay after one full year of employment. Thereafter, an employee becomes eligible for an additional one week vacation time on the anniversary of his/her employment up to a maximum of six weeks. The amount of vacation with pay is determined by length of service. Since the debtor requires its employees to take vacation time earned in a given calendar year during that calendar year, all vacation time earned during calendar year 1982 has either been taken or paid. The only vacation time in issue is that which is

scheduled to be taken in 1983. The debtor erroneously concludes that the only pre-petition claims for vacation would be the claims of employees whose anniversary date fell within the period January 1, 1983 to February 28, 1983.[1] Although for its bookkeeping convenience, the debtor records vacation time by anniversary date, it is in fact earned each year. Vacation benefits are included within the § 507(a)(3) priority. Therefore, there is both the 90-day and unused balance of $2,000 limits. The debtor argues that the cases which hold that vacation is "earned" for wage priority purposes on a day to day basis do not apply[2] in a Chapter 11 with an ongoing business. If that were a valid distinction, it would at the very least have to await confirmation of a plan, a consummation not always realized. Section 507 applies to both Chapter 7 and Chapter 11 cases. 11 U.S.C. § 103(a). If Congress intended for priorities to be applied differently in ongoing Chapter 11 reorganizations, Congress would have so provided in the Code. The case of *Matter of Penn Central Transportation Co.*, 411 F.Supp. 1079 (E.D.Pa.1976), vacated on other grounds, 570 F.2d 1189 (3rd Cir.1978) is inapposite. The issue there was who was liable for accrued vacation pay as between the old and new owner. The approach envisioned by the priorities enunciated in the Code and consistent with the manner in which vacation time is actually earned is to treat vacation pay as earned on a pro rata basis just as wages are earned on a day to day basis. *See In re Schatz Federal Bearings Co., Inc.*, 5 B.R. 549, 6 B.C.D. 749 (Bkrtcy.S.D.N.Y.1980); *In re Straus-Duparquet, Inc.*, 386 F.2d 649, 650 (2nd Cir.1967) (vacation pay earned from day to day over the period of a year, and therefore priority only to the extent of proportionate part of total vacation earned during relevant priority period); *see also In re Mammoth Mart,*

---

1. According to the debtor, there are 34 such employees whose claims total $50,643.70.

2. *See e.g., In re Ad Service Engraving Co.*, 338 F.2d 41 (6th Cir.1964); *U.S. v. Munro-Van Helms Company, Inc.*, 243 F.2d 10 (5th Cir. 1957); *Division of Labor Law Enforcement.*

*State of California v. Sampsell*, 172 F.2d 400 (9th Cir.1949); *Kavanas v. Mead*, 171 F.2d 195 (4th Cir.1948); *In re Public Ledger, Inc.*, 161 F.2d 762 (3rd Cir.1947), *In re Wil-low Cafeterias, Inc.*, 111 F.2d 429 (2nd Cir.1940).

536 F.2d 950 (1st Cir.1976) (applying the same theory as to severance pay claims).

■ The employees are entitled to a § 507(a)(3) priority for the vacation pay earned for the 90 days prior to the date of filing. The time accumulated from the previous vacation would be reduced to a proportion attributable to the 90 days prefiling and allowed up to the $2,000 limit. The remainder of the vacation pay is merely a general claim entitled to no priority. In recognition of the human problem involved, the Court will allow current application on an administrative expense basis for the vacation time earned from the date of filing to the date the vacation is taken. For example, if an employee is entitled to four weeks as of August 28, 1983 (six months after filing), that employee would be able to take three weeks of vacation time—one week for the 90 day pre-petition priority period under § 507(a)(3), assuming a sufficient balance available. in the $2,000 limit, and two weeks as an administrative expense. If there was no balance left on the $2,000 limit, the employee would still be entitled to the two weeks' vacation earned during the post-petition period.

## MOTION TO PAY PRE–PETITION EXPENSES OF SALESPEOPLE

The debtor seeks to reimburse salespeople for expenses incurred within the 90 days prior to the filing because the expenses could reasonably be considered a part of the employees' salary, wages, or commissions. Similarly, this motion is allowed, to the extent that any unused balance remains in the $2,000 priority.[3]

## MOTION TO PAY FEBRUARY, 1983 EM-PLOYER CONTRIBUTION TO U.F.. C.W. LOCAL 592 HEALTH AND WELFARE PLAN

■ The debtor seeks authority to make the February contribution to the Union Health & Welfare Fund of $18,285.[4] Section 507(a)(4) of the Code covers priority payments for contributions to employee benefit plans and provides:

(a) The following expenses and claims have priority in the following order:

(4) Fourth, allowed unsecured claims for contributions to employee benefit plans—

(A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

(B) for each such plan, to the extent of—

(i) the number of employees covered by such plan multiplied by $2,000; less

(ii) the aggregate amount paid to such employees under paragraph (3) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

The Court will allow the payment of the contribution to the extent that the formula provided in § 507(a)(4)(B) would permit a payment to be made. The debtor will first have to pay all the third priority claims which have been allowed. Once the formula is applied, the debtor will not be permitted to make any further third priority payments. Before making any of the payments provided for in this Order, the debtor shall prepare and file a complete accounting of the third priority payments made showing the payments to each employee separately for all priority wages or other benefits and the determination of the balance payable under the fourth priority.

When and if a plan is prepared, the debtor may consider dealing with any of these

---

**3.** The Court notes that expenses are not specifically included in § 507(a)(3). However, in recognition of the need for a satisfied sales force and the salesperson's reliance on reimbursement of their expenses, the Court will permit the reimbursements to be made under the § 507(a)(3) priority.

**4.** In its memorandum, the debtor states that the Union has indicated that the non-payment of the debtor's February contribution to the Health & Welfare Fund may result in the group plan being cancelled. The parties' attention is called to Section 362.

remaining unpaid employee claims in the context of that plan.