### In re The GROUND ROUND, INC., et al., Debtors.

### No. 04–11235–WCH.

United States Bankruptcy Court, D. Massachusetts.

Oct. 19, 2004.

424

Charles R. Bennett, Jr., Andrew G. Lizotte, Harold B. Murphy, Jesse I. Redlener, Lead Attorney, Alex M. Rodolakis, Hanify & King, P.C., Boston, MA, for Debtors.

John Fitzgerald, Office of the US Trustee, Boston, MA, for Trustee.

## DECISION REGARDING SUPPLEMENTAL MOTION FOR ENTRY OF AN ORDER AUTHORIZING PAYMENT OF CERTAIN PRE-PETITION SALARIES, HOURLY WAGES, AND BENEFITS

WILLIAM C. HILLMAN, Bankruptcy Judge.

This decision will dispose of the last remaining issues regarding certain relief sought by the Debtors regarding the payment of certain wages and benefits to present and former employees. For the reasons stated, I hold that employees are entitled to priority wage claims to the extent discussed below.

### Background

On February 25, 2004, Debtors filed their original motion seeking authorization to pay certain prepetition wages and expenses, up to the priority cap set forth in 11 U.S.C. § 507(a)(3), to a number of employees, and certain related relief.[1] I

---

1. *Motion by Debtors and Debtors in Possession for Authorization to (A) Pay Certain Pre-Petition Salaries, Hourly Wages and Benefits and*

granted that motion on March 2, 2004.[2]

On May 7, 2004, Debtors filed the "supplemental motion" for the payment of certain other wages and benefits due to former employees.[3] The Official Unsecured Creditors' Committee (the "Committee") filed an objection.[4] The Commonwealth of Massachusetts (the "Commonwealth") filed a limited objection.[5] Boston Ventures Limited Partnership V ("BVLP"), which had provided postpetition financing to Debtor through GRR Holdings, LLC ("GRR"), an affiliate, consented to the motion and responded to the Committee's objection.[6] Debtors replied to the two objections.[7] After a hearing, the parties agreed on most of the issues and an order was entered granting much of the relief sought.[8] As to the remaining issues, I directed that an agreed statement of facts and memoranda be filed.[9] Memoranda were filed by all of the objecting and supporting parties.[10]

### Agreed Statement of Facts

As there is no disagreement as to the applicable facts, I adopt the Agreed Statement of Facts [11] as my findings of fact. It provides as follows:

1. On February 19, 2004 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of 11 U.S.C. § 101, *et seq.* ("Bankruptcy Code") with this Court. Since the Petition Date, the Debtors have operated as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2. On March 1, 2004, the Office of the United States Trustee appointed the Official Unsecured Creditors' Committee ("Committee").

3. Prior to the Petition Date, the Debtors operated and franchised 132 Ground Round Grill & Bar Restaurants and similar style restaurants in twenty-five (25) states, as well as Canada. Of this amount, seventy-three (73) restaurants operated under the franchise system. The remaining fifty-nine (59) restaurants were company owned and operated ("Company Restaurants").

4. All employees were terminated on February 13, 2004, six days prior to the Petition Date, because of a termination of the Debtors' credit facility. Prior to such time, the Debtors employed more than 3,400 individuals at the corporate home office and as restaurant employees at the Company Restaurants.

5. As of September 10, 2004, approximately 3,400 former employees (mostly hourly employees) had claims against the Debtors for accrued and unpaid va-

*(B) Use Existing Payroll Accounts and Business Forms,* Docket No. 37.

2. Docket No. 91.

3. *Supplemental Motion for Entry of an Order (A) Authorizing Payment of Certain Prepetition Salaries, hourly Wages, and Benefits and (B) Granting Related Relief,* Docket No. 761 (the *"Supplemental Motion "*).

4. Docket No. 815.

5. Docket No. 820.

6. Docket No. 858.

7. Docket No. 929.

8. Docket No. 1028.

9. Proceeding Memorandum, Docket No. 1156.

10. Docket Nos. 1262 (BVLP), 1265 (Committee), 1266 (Debtors), and 1272 (Commonwealth). Notwithstanding its limited objection, the Commonwealth supported the granting of the motion.

11. Taken from Debtors' Memorandum, Docket No. 1266, pp. 4–6.

cation pay for services rendered prior to the Petition Date.

6. Debtor's Employee Reference Handbook ("Company Policy") established the terms under which employees earned and were paid for vacation time.

7. Pursuant to Company Policy, Hourly Employees earned vacation time with pay evenly throughout the first six months of each fiscal year (which commenced on or about October 1). Consequently, after the first six months of the fiscal year concluded, vacation time for the entire year would be earned. The amount of vacation time which an Hourly Employee could earn was based upon length of service and average hours worked. Vacation time was paid at the employee's current primary job rate (equal to the employee's hourly wage).

8. Salaried Employees were eligible for up to five weeks vacation with pay based upon length of continuous service. The Salaried Employee would become eligible for the entire amount of annual vacation time as of their "eligibility date." The eligibility date for each employee, determined based upon an individual's date of hire, was as follows:

(a) the anniversary date of an individual's employment for those employees hired on or after October 1, 1986;

(b) October 1 of each year for those employees hired prior to April 1, 1986; and

(c) March 1 of each year for those employees hired between April 1, 1986 and September 30, 1986.

Vacation pay for Salaried Employees was paid at the employee's current base rate (equal to the employee's salary).

9. The outstanding accrued and unpaid vacation pay which would be entitled to priority status under Section 507(a)(3) of the Bankruptcy Code is set forth below, depending upon whether the vacation pay is calculated in accordance with Company Policy or is deemed earned evenly throughout the year regardless of Company Policy:

|  | Company Policy Method | Ratable, or Pro Rata Method |
|---|---|---|
| Hourly Employees | $212,923 | $106,462 |
| Salaried Employees | $109,602 | $120,245 |
| Total | $322,524 | $226,707 |

The parties implicitly agree that the amount which may be authorized to be paid under the Supplemental Motion is the total claims which would be entitled to priority under § 507(a)(3), "to the extent of $4,650 for each individual ... earned within 90 days before the date of the filing of the petition, or the date of the cessation of the debtor's business, whichever occurs first, for ... wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual..."[12] Of course, to the extent that previous orders have resulted in the payment to a particular employee of wages entitled to the statutory priority, the vacation pay limit for that person will be reduced.[13]

*Discussion*

As noted above, the rights of the parties under state law are clear. My obligation is to take those rights and then look at

---

**12.** BVLP correctly points out that Debtor has computed the period from the petition date, which was six days after all employees were terminated, and it is the earlier date which controls under the statute. Docket No. 1262, p. 3. However, this should not make a difference to the hourly employees and, as will be seen, it will not affect the treatment of the salaried employees.

**13.** *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.),* 536 F.2d 950, 952 n. 1 (1st Cir.1976); *In re Columbia Packing Co.,* 35 B.R. 447, 449 (Bankr.D.Mass.1983).

federal law to "decide where the obligation stands in the queue." *In re Northwest Engineering Co.,* 863 F.2d 1313, 1315 (7th Cir.1988). My primary task is to determine the meaning of "earned" in § 507(a)(3).

### A. Hourly Employees

█ Debtor urges that I interpret "earned" as having the meaning set forth in Company Policy; that is, the vacation pay is "earned", within the meaning of the statute, when the right to it has accrued under the Policy. As to hourly employees, this would result in the "earning" of two vacation days per month for each of the first six months of the fiscal year, which begins on October 1. Under this view, hourly employees earned one-half of their vacation pay during the priority period.[14] The Committee, on the other hand, urges me to disregard the terms of the Company Policy and rule that vacation pay accrues on a daily basis.[15] This would result in only one-quarter of annual vacation pay for the current year to be entitled to the priority.

*Northwest Engineering* is one of the rare circuit court cases on point under the Bankruptcy Code. In that case, vacation pay was earned in a calendar year but could not be utilized until the employee had worked one day in the following year. The first element was called the "work requirement" and the latter, the one-day-in-the-next-year provision, the "vesting requirement." The debtor filed on April 1. The employees urged entitlement to the third priority for the entire prior year's vacation pay since the vesting requirement was satisfied within the 90–day prepetition window. The Debtor contended that the vacation had been "earned" within the pre-vious year and hence outside of the preference period. Judge Easterbrook analyzed the situation as follows:

> "Earned" could take any of at least four meanings. (i) Vacation pay may be earned as work is done, with or without regard to the vesting rules in a given firm's contracts. (ii) Vacation pay may be earned as work is done, but only if the right to receive pay has vested (that is, if there is a contractual debt). (iii) Vacation pay may be earned on the day the right to receive it vests. (iv) Vacation pay may be earned on the date payment is due. The choice is easy if vacation pay accrued so many hours per week or month, for then it vests as soon as the work is done and is due on demand; the definitions coalesce. This is a common method of awarding vacation pay—treating vacation pay as no different in principle from an immediately-available bonus on wages—and must have been the model on which § 507(a)(3) was based. The statute uses a single word, "earned", to refer to wages and vacation pay, and the continual-accrual method, which the national government uses for its own employees, is well known in Washington. No legislative history suggests a different meaning to "earned". Indeed no legislative history suggests any meaning of "earned" . . . . everyone assumed that "earned" has an obvious meaning.

*Id.* at 1314–1315.

After an extensive discussion of the possibilities, the Seventh Circuit concluded that it would adopt "a sensible outcome, in accord with the statute's goal: the employee gets a priority equal to the value of services rendered in the 90 days before bankruptcy." *Id.* at 1317.

---

**14.** BVLP (Docket No. 1262, pp. 5–7) and the Commonwealth (Docket No. 1272) support Debtor's position in this regard.

**15.** Docket No. 1265, pp. 3–4.

If I were to follow that principle, the hourly employees would receive a maximum of one-quarter year's vacation pay, rather than double that amount. The Commonwealth asks that I reject *Northwest Engineering*, as the court there was faced with an all-or-nothing situation and its decision was practical only.[16] It would have me agree with the Debtor, which urges me to follow the Company Policy.[17]

The only authority in this district is Judge Lavien's decision, *In re Columbia Packing Co.*, where he held that

> The approach envisioned by the priorities enunciated in the Code and consistent with the manner in which vacation time is actually earned is to treat vacation pay as earned on a pro rata basis just as wages are earned on a day to day basis.

35 B.R. 447, 449 (Bankr.D.Mass.1983).

Judge Lavien was following a Second Circuit decision under the Act, *Straus–Duparquet*,[18] which held that vacation pay "is generally regarded as earned from day to day over the period of a year intervening between vacations."[19]

I regard this as a better reading of "earned" and will therefore sustain the objection. Hourly paid employees are entitled to the priority only for vacation pay accruing during the period and only up to the available maximum. The remainder of

their unpaid vacation pay will be treated as general unsecured claims.

## B. Salaried Employees

■ Salaried employees become entitled to a full year's vacation pay on their "eligibility date," which was generally the anniversary of the date of hiring. As a result, says Debtor, salaried employees either earned a full year's benefit during the priority period if their eligibility date fell within the period, or none at all if it fell outside. As a compromise, however, "the Debtors will concur with the Committee that Salaried Employee priority vacation wages may be deemed earned evenly throughout the year."[20] BVLP joins in this proposal.[21]

While I am somewhat uncomfortable with this settlement as it might result in giving some employees vacation pay where there was no entitlement under the Policy,[22] it is within the range of possible outcomes on the issue and I will accept it as manifesting an exercise of reasonable business judgment by Debtor.

### Conclusion

I hold that employees, both hourly and salaried, are entitled to priority under § 507(a)(3) for vacation wages earned on a day to day basis. This results in a maximum priority claim of a quarter-year vacation benefit for all employees.

---

16. Docket No. 1272, p. 3. I assume this to be a polite way of saying that the Seventh Circuit decision was result driven and does not follow the statute.

17. Docket No. 1266, pp. 6–8.

18. *Straus–Duparquet, Inc. v. Local Union No. 3 IBEW (In re Straus–Duparquet, Inc.)*, 386 F.2d 649, 650 (2nd Cir.1967). (This is the vacation pay portion of the decision, not the latter part which deals which severance pay and which is contrary to the First Circuit's holding in *Mammoth Mart, supra* ).

19. *Ibid.*

20. Docket No. 1266, p. 3.

21. Docket No. 1262, pp. 8–9.

22. "To give priority to a claimant not clearly entitled thereto is not only inconsistent with the policy of equality of distribution; it dilutes the value of the priority for those creditors Congress intended to prefer." *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 953 (1st Cir.1976).

The Debtor is directed to recompute the amounts payable as a result of this decision and to submit a proposed order within two weeks. The proposed order shall be served on the Committee, BLVP, and the Commonwealth, and any other party in interest who has requested notice. If no objections are received within two weeks after the submission of the proposed order, it will be entered at the end of that period. If any objections are filed, a hearing will be scheduled.