**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

**Appeal of CONSOLIDATED RAIL CORPORATION and United States Railway Association, in Nos. 76–1514, 1515, 1516.**

**In the Matter of LEHIGH VALLEY RAILROAD COMPANY.**

**In the Matter of READING COMPANY, Debtor.**

**Nos. 76–1514 and 76–1516.**

United States Court of Appeals, Third Circuit.

Argued as to Nos. 76–1515 and 76–1516 on Jan. 4, 1977.

Submitted as to No. 76–1514 on Dec. 1, 1977.

Decided Feb. 3, 1978.

John G. Harkins, Jr., Laurence Z. Shiekman, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellant, Consolidated Rail Corp.

James E. Howard, Philadelphia, Pa., Charles A. Horsky, Covington & Burling, Washington, D. C., for appellees, Robert W. Blanchette, Richard C. Bond and John H. McArthur, Trustees of the property of Penn Central Transp. Co., Debtor.

Lewis A. Grafman, Philadelphia, Pa., Edwin Rector, Howard M. Wilchins, U. S. Railway Association, Stephen C. Rogers, U. S. Railway Ass'n, Washington, D. C., for appellant, United States Railway Association.

Howard H. Lewis, Jeffrey B. Rotwitt, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for appellees, Andrew L. Lewis, Jr. and Joseph L. Castle, Trustees of Reading Co.

Frederic L. Ballard, Oliver C. Biddle, Lewis A. Grafman, James D. Coleman, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for appellees, Institutional Investors and Certain Indenture Trustees.

William R. Traub, Duane, Morris & Heckscher, Philadelphia, Pa., for appellee, Lehigh Valley Railroad Co.

Before ADAMS, VAN DUSEN, Circuit Judges, and TEITELBAUM, District Judge.*

## OPINION OF THE COURT

ADAMS, Circuit Judge.

These appeals arise out of railroad reorganization proceedings pertaining to the Penn Central Transportation Company, the Reading Company and the Lehigh Valley Railroad Company. Specifically, the Consolidated Rail Corporation (ConRail) and the United States Railway Association (USRA) challenge rulings entered by the reorganization courts in the course of proceedings under § 211(h) of the Regional Rail Reorganization Act of 1973, as amended by the Railroad Revitalization and Regulatory Reform Act of 1976 (together referred to here as the "Rail Act").

Two issues are presented: first, whether we have jurisdiction over the orders in question that were entered by the reorganization courts; and second, whether the reorganization courts erred in ruling that as a matter of law it was not proper to identify the sums of money held in the escrow accounts in question as "cash and other current assets" within the meaning of § 211(h)(3)(A), and thus transferable to ConRail. We have concluded that both questions should be answered in the affirmative.

### A.

The Rail Act, 45 U.S.C. §§ 701, et seq., arose out of a recognition of the crisis that resulted from the bankruptcies of a number of railroads in the Northeast and the Midwest. It represented Congress' response to this "threat to the national welfare." *In Re Penn Central Transportation Company,* 384 F.Supp. 895, 902 (Special Court, 1974).

An overriding theme of the Rail Act is the protection of the public interest in con-

---

* United States District Judge for the Western District of Pennsylvania, sitting by designation.

tinued operation of rail services.[1] Among the principal tenets emerging from the Act itself, its legislative history and court decisions upholding its constitutionality are the following:

First, it was necessary to restructure the rail system in the affected region, in particular by creating ConRail;[2] second, ConRail was to be allowed to begin its existence with a relatively clean slate, so that rail properties, with a few express exceptions, were to be transferred to it free of liens and encumbrances;[3] third, the estates[4] were to continue rail operations until the day of conveyance of the rail properties to ConRail; fourth, to offset to some extent the financial burden imposed on the estates by requiring them to continue rail operations up to the date of conveyance, Congress provided for grants and loans to the estates under reorganization;[5] and fifth, a remedy under the Tucker Act was found to exist, and to be constitutionally sufficient, in the event that compensation received by the estates pursuant to the Rail Act proved inadequate to cover the erosion of assets, if any, which occurred during the period of operations.[6]

§ 211(h), one of the 1976 amendments to the Rail Act, should be viewed against this background. It allows for the provision of financial means by which certain pre-conveyance obligations of the estates, unpaid at the date of the conveyance of the rail assets to ConRail, may be satisfied "in order to avoid disruptions in ordinary business relationships."[7] The section was predicated upon the realization that the estates, in maintaining rail operations up to the date of the conveyance, would accumulate unpaid obligations to other railroads, shippers, suppliers and labor sources; and that there should be some mechanism facilitating payment of such obligations in order to prevent disruption of service or a smooth transition. Pursuant to § 211(h)(3)(A), USRA was authorized to petition the reorganization courts for an order identifying "cash and other current assets" of the estates which were to be made available in the post-conveyance period to pay pre-conveyance obligations, as identified in Section 211(h)(1). And USRA could seek an order providing for the payment of such obligations by the trustees.

The disputes regarding the merits of this appeal arose in the course of hearings held by the reorganization courts pursuant to § 211(h)(3). During the hearings, USRA sought an order to identify various accounts held by the estates—including escrow accounts—as "cash and other current assets" within the meaning of § 211(h)(3)(A). USRA also requested a directive that vacation pay which had accrued prior to the conveyances by the estates to ConRail continue to be an obligation of the estates. In

---

1. That Congress was concerned about protecting such a public interest is clearly demonstrated in the legislative history of the Rail Act. For example, in the Report of the Senate Commerce Committee, pertaining to the Rail Reorganization Act of 1973, the following statements are made:

   Rail transportation problems in the Northeast and Midwest region of the National (sic) are approaching crisis proportions. At this time, seven class I railroads, as well as one class II carrier, are in bankruptcy. . . . Their services are not only essential to the prosperity and well-being of the people and industry in the Northeast and Midwest, but they are essential to the well-being and prosperity of the Nation as a whole. Cessation of services on the Penn Central alone would have drastic consequences throughout the United States. . . . The entire economy of the United States would suffer drastically if railroads in the

   Northeast and Midwest shut down operations.
   *Sen.Rep.* No. 93–601, 93d Cong., 1st Sess., *reprinted in* (1973) *U.S.Code Cong. & Admin. News,* pp. 3242, 3248–3249.

2. *See* 45 U.S.C. §§ 701, 716, 742.

3. *See* 45 U.S.C. § 743(b).

4. The "estates" are the estates in bankruptcy, the railroads that are in reorganization and that are the appellees in these appeals.

5. *See* 45 U.S.C. §§ 723, 725.

6. See *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 148–156, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

7. 45 U.S.C. § 721(h)(1).

response, the estates objected to the granting of an order to identify the accounts, and took the position that the accrued vacation pay was not an obligation of the estates after March 31, 1976, the date of the conveyances to ConRail.

In response to these motions, the reorganization courts ruled that (1) it was not proper to identify the sums of cash held in escrow accounts as "cash and other current assets," and (2) as of April 1, 1976, the vacation pay that had been a pre-conveyance obligation of the estates ceased to be such and instead became an obligation of ConRail. ConRail and USRA filed joint notices of appeal from the orders entered by each of the reorganization courts, and the appeals were then consolidated.

After oral arguments dealing with the consolidated appeals, the cases were held in abeyance at the request of the parties, who sought to resolve their differences amicably. Thereafter, the parties advised the Court that they had settled their differences regarding vacation pay, but not as to the status of the various escrow accounts. In practical terms, the effect of the rulings by the reorganization courts relating to the escrow accounts is that ConRail would have a lesser amount of cash available with which to pay pre-conveyance obligations than would have been available had the accounts been designated "cash and other current assets" under the terms of the Act and thereafter transferred to ConRail.

### B.

The threshold question is whether, at this point in the litigation, we have jurisdiction over the appeals from the orders in question. The jurisdictional issue has arisen because, as the estates maintain, the orders by the reorganization courts of concern here are interlocutory, not final.

As a general rule, of course, this Court hears appeals only from orders of the district courts that are final. *See* 28 U.S.C. § 1291; *Bachowski v. Usery*, 545 F.2d 363, 368–369 (3d Cir. 1976). However, among the limited exceptions to this rule are interlocutory orders issued pursuant to "proceedings in bankruptcy" under § 24(a) of the Bankruptcy Act, 11 U.S.C. § 47(a).[8] Therefore, the issue before us is whether the orders here fall within the category of those interlocutory orders that are appealable under the Bankruptcy Act.

USRA and ConRail maintain that the orders in question are appealable. In opposition, the estates argue, first, that § 24(a) of the Bankruptcy Act applies only to appeals arising from orders entered pursuant to a court's bankruptcy powers, and that the orders in this case were not entered under the courts' bankruptcy authority, but rather were entered under § 211(h)(3) of the Rail Act. For this reason, say the estates, the orders are not appealable as a general matter under the Bankruptcy Act. Second, the estates urge, even if the orders here are construed as having been entered pursuant to the courts' bankruptcy powers, they flow from "controversies arising in proceedings in bankruptcy," not out of "proceedings in bankruptcy," and as such are not appealable under the terms of § 24(a) of the Bankruptcy Act.

The estates' first argument—that the issuance of orders under § 211(h)(3) does not constitute an exercise of the courts' bankruptcy powers—rests in part on the notion that the passage by Congress of the Rail Act, including § 211(h)(3), involved the exercise of a number of constitutional powers: namely, Congress' powers to act in the areas of bankruptcy, of eminent domain, and of interstate commerce. The estates contend, in effect, that because Congress, in passing the Act, relied on more than its bankruptcy power alone, a court acting pursuant to the Act necessarily exercises more than its bankruptcy power taken singly.

8. 11 U.S.C. § 47(a) provides that:

The United States courts of appeals . . . are invested with appellate jurisdiction from the several courts of bankruptcy in their respective jurisdictions in proceedings in bankruptcy, either interlocutory or final, and in controversies arising in proceedings in bankruptcy, to review, affirm, revise or reverse, both in matters of law and in matters of fact . . . .

Such an argument is flawed because it avoids discussion of the particular issue arising in the judicial action in question. It is imaginable, of course, that a reorganization court will undertake to resolve a controversy under the Rail Act that does not call for the exercise of the court's bankruptcy power. However, this does not exclude the possibility that in adjudicating an issue under the Rail Act, the Court may primarily act pursuant to the bankruptcy power. In the latter case, the argument that the Rail Act as a whole is grounded on several constitutional powers appears to miss the mark.

Thus, the proper focus of the estates' first contention is the claim that the orders of the reorganization courts contested in the present case involve issues that could not have arisen in a hearing predicated solely on the courts' bankruptcy power. In particular, the estates in effect maintain that ConRail's ability to provide uninterrupted rail service is the issue of concern here, and that such issue could not have arisen in a bankruptcy proceeding.

But even assuming *arguendo* that this is so, the estates have not shown that the non-bankruptcy-related matter of the continuation of rail service is central to the resolution of the dispute presented by these appeals. The underlying controversy dividing the parties relates to the legal status of certain cash accounts, referred to as escrow accounts. It is true that the determination of the status of those accounts would involve a consideration of the nature of the transactions giving rise to the accounts. But, such an investigation would appear to be the kind of activity that is within the ambit of the duties of a bankruptcy judge.

As Judge Friendly has written in a context different from that of railroad reorganization, "(t)he bankruptcy power . . . is not limited to what Congress may choose to call a bankruptcy proceeding." *Exchange National Bank of Chicago v. Wyatt*, 517 F.2d 453, 459 (2d Cir. 1975). Rather, one must consider whether the issues of concern to the parties ". . . are of the same type as could have arisen in a proceeding which avowedly was based solely on the bankruptcy power, a power 'whose boundaries may not yet be fully revealed,' *Continental Illinois Nat'l Bank & Trust Co. v. Chicago R. I. & P. Ry.*, 294 U.S. 648, 671, 55 S.Ct. 595, 79 L.Ed. 1110. . . ." 517 F.2d at 459. In our view, the specific dispute in the present case is one that "could have arisen" and, indeed, has arisen, in a bankruptcy proceeding.

The estates' next argument—that the orders in question were issued pursuant to "controversies arising in proceedings in bankruptcy," not to "proceedings in bankruptcy"—also raises a difficult problem. As the estates note, § 24(a) of the Bankruptcy Act allows appeals as of right from either interlocutory or final orders from "proceedings in bankruptcy," whereas only final orders from "controversies arising in proceedings in bankruptcy" are appealable. *See In Re Durensky*, 519 F.2d 1024, 1027 (5th Cir. 1975). Since, as the estates maintain, the orders of concern here are interlocutory, and they were not issued pursuant to "proceedings in bankruptcy," the estates conclude that such orders are not appealable under the terms of the Bankruptcy Act.

The differentiation between "controversies arising in proceedings in bankruptcy" and "proceedings in bankruptcy" is hardly pellucid. In *In Re Durensky, supra,* 519 F.2d at 1027, the Fifth Circuit wrote:

> As a general rule, 'proceedings' are those matters of an administrative character, including questions between the bankrupt and his creditors, which are presented in the ordinary course of the administration of the bankrupt's estate. 'Controversies', on the other hand, are usually described as matters which arise in the course of the bankruptcy proceedings which are not mere steps in the ordinary administration of the bankrupt, but which present distinct and separable issues between the trustee and adverse claimants concerning the right and title to the bankrupt's estate.

Since, as the *Durensky* court acknowledged, the analytical separation between "controversies" and "proceedings" is frequently

elusive, in the end courts have often tended to opt for a case-by-case classification.[9]

One approach to the statutory distinction that tends to provide it with concrete meaning has been offered by the Second Circuit in *United Kingdom Mutual SS Assur. Assoc. v. Liman,* 418 F.2d 9 (1969).[10] *Liman* differentiates the two types of matters—"controversies" and "proceedings"—by reasoning that a matter falls within the rubric of "controversies" if it involves a claimant who "raises a dispute with regard to the propriety of including property in the estate for distribution, rather than a question with regard to the administration of the estate once it is amassed." 418 F.2d at 10. *See* 9 Moore's *Federal Practice* § 110.19(5), at 222 (2d ed. 1975).

█ In the present appeal, both parties agree that the railroad estates have certain cash accounts. And there is no doubt that these accounts were assets of the bankrupt railroads prior to the conveyances to ConRail. The question to be resolved, then, is whether these accounts are in the nature of "cash and other current assets," and thus transferable to ConRail at the date of the conveyances under the Rail Act. The resolution of this specific issue does not turn on what is amassed in order to arrive at the total of the bankrupt's assets; rather, the resolution of the issue rests on what the nature of these assets is determined to be. The identification of the status of an asset that is concededly part of a bankrupt's estate would appear to be a matter involving the administration of that estate.[11]

One rejoinder by the estates is that § 211(h)(3) of the Rail Act was not intended by its framers primarily to facilitate the reorganization of the estate of a bankrupt, but rather was to insure continued operation of rail facilities that eventually were transferred by the estates to ConRail. Although this, as a general proposition, is beyond dispute, it does not generate the jurisdictional result sought by the appellees. For the issue before this Court, as we have concluded, entails—at least in part—a matter of the *administration* of an estate that has been amassed. The fact that the occasion for amassing the assets of the estate arose primarily out of a decision to transfer rail properties to ConRail does not undermine the validity of our determination.[12]

**9.** Although the most common definitions of "proceedings in bankruptcy" is the one embraced by the court in *Durensky,* some courts have been more specific in their definitions. Thus, as the court said in *Morehouse v. Pacific Hardware & Steel Co.,* 177 F. 337, 339–340 (9th Cir. 1910), the term will:

> . . . include all questions arising in the administration of the bankrupt's estate, such as the appointment of receivers, *orders requiring the bankrupt to surrender property of the estate in bankruptcy,* orders requiring the bankrupt's voluntary assignee to surrender property of the estate, orders giving priority to the claim of the creditor, orders directing a setoff of mutual debts, and orders confirming the composition. (emphasis added)

*See also Broders v. Lage,* 25 F.2d 288, 289 (8th Cir. 1928); 4 *Collier on Bankruptcy,* §§ 24.12–24.45 (14th ed. 1976).

**10.** In *Liman,* an insurer brought an action against a bankrupt for unpaid premiums. The trustee claimed against the insurer money that he had paid on personal injury claims. After the referee in bankruptcy determined that he had jurisdiction over the trustee's claim, the district court denied review of the order relating to jurisdictions. From this decision the insurer appealed. The Second Circuit dismissed the appeal, saying:

> Although summary jurisdiction is based upon the fact that United Kingdom is a creditor of the estate, that should not automatically classify this indemnification question between the trustee and the creditor as one in a proceeding. Here we feel that judicial economy is best served by emphasizing the contest over augmentation of the estate, holding it to be a 'controversy' even though it comes in by way of counterclaim to the assertion of the insurer's premium claims.

418 F.2d at 11.

**11.** Indeed, if in the present case the reorganization courts were to identify some of the accounts in question as "cash and other current assets," the effect of such designation in this situation would appear to be similar to that of "orders requiring the bankrupt to surrender property of the estate in bankruptcy." *Morehouse v. Pacific Hardware & Steel Co.,* 177 F. 337, 339–340 (9th Cir. 1910).

**12.** In essence, the estates would have this Court refuse to exercise its jurisdiction basically because ConRail and USRA are asserting rather unique statutory claims before special reorganization courts. Having considered the

## C.

Inasmuch as we have concluded that the Court has jurisdiction over these appeals, we now turn to the merits of the arguments raised by the parties regarding the disposition of the accounts. The central inquiry in this respect is whether the reorganization courts erred in declining to order that any of the escrow accounts in question be identified as "cash and other current assets" of the estates.

Section 211(h)(3) provides that USRA may seek an order that:

(A) identifies that cash and other current assets of the estate of such railroad which shall be utilized to satisfy obligations of the estates identified in Paragraph 1 of this subsection; and

(B) provides for the application by the trustees of such railroads and their agents, . . . of all such current assets . . . to the payment in the post-conveyance period of the obligations of the estates identified in Paragraph 1 of this subsection.

In the absence of legislative history illuminating the subject, the reorganization courts chose to interpret the term "cash and other current assets" that is employed in § 211(h)(3) as having the same meaning as the category of "current assets" in the ICC system of accounts. In his proceeding, Judge Fullam ruled that the arguments, presented by ConRail and USRA, to the effect that escrow funds and other liened assets may be tapped to pay claims incurred by the estates in the pre-conveyance period, are inapposite. Three reasons were given in support of this position: first, the assets are carried in an account denominated under the ICC system as "Capital and other reserve funds," and thus are not current assets; second, they are not "available" to the trustees within the meaning of § 211(h)(3); and third, the position that they are "cash and other current assets" cannot be reconciled with the restrictive time frame established by Congress for an order to be entered pursuant to § 211(h)(3).[13]

The first point rests primarily on the fact that the funds largely have been carried by the estates in a classification required under the ICC system of accounts, namely, in ICC Account No. 716, "Capital and other reserve funds." It should be noted that the origins of these funds have varied, with some of the money having been derived from the sale of capital assets and some from other sources.

ConRail and USRA contend that the reliance of the reorganization courts on the ICC method of accounting in determining the status of the accounts is not controlling. So long as the estates were actually conducting rail operations, ConRail and USRA maintain, the funds in question had to be carried in an account with a nomenclature other than for "current assets", as defined by the ICC.[14] Moreover, as ConRail and USRA assert, once rail operations that were conducted by the estates ceased—as they did on March 31, 1976—the distinction drawn in the ICC system of accounts between current and non-current assets was rendered inapplicable. ConRail and USRA urge that because the functional purpose of the distinction—to separate funds used to support current railroad operations from those not so used—became irrelevant as

nature of the controversy in this case, we decline to so rule.

**13.** *See In the Matter of Penn Central Transportation Company, Debtor,* 411 F.Supp. 1079, Memorandum in Support of Order No. 2297 E.D. Pa. Bankruptcy (1976).

**14.** ConRail and USRA note that the ICC definition of "current assets" is similar to the one employed in general accounting practice. The ICC definition of a current asset includes within that term, "cash, those assets which are readily convertible into cash or are held for current use in operations, current claims

against others and amounts accruing to the carrier which are subject to settlement in the ordinary course of business within one year." ICC, *Uniform System of Accounts for Railroad Companies,* at 27. The standard definition of "current assets" is "cash and other assets or resources commonly identified as those which are reasonably expected to be realized in cash or sold or consumed during the normal operating cycle of the business." American Institute of Certified Public Accountants, *Accounting Research Bulletin* No. 43 (1961), at 20, 3 CCH AICPA Professional Standards § 2031.

soon as the estates stopped operating the railroads, the distinction itself no longer was appropriate.

At the moment of conveyance to ConRail, ConRail and USRA claim, a more realistic test for distinguishing between capital and current assets would look to the nature of the asset—namely, whether it is "in the form of cash or in some other form readily reducible to cash versus a form not currently reducible to cash." [15]

The "nature of the asset" test, in our view, is preferable to the test followed by the reorganization courts. Since the aim of § 211(h)(3) is to make funds available to pay promptly administrative expenses that will have to be paid in any event, it is reasonable to conclude that Congress would have intended to apply against such expenses funds in the nature of "cash and other current assets", even though such funds were not kept in an account designated a current asset when the estates were still operating the rail properties.

In response, the estates argue, that the reorganization courts were correct in concluding that the heterogeneous collection of accounts in question could not be deemed "cash and other current assets." The weakness of the estates' position is that while it concedes, on the one hand, that the accounts in question are heterogeneous, it seeks, on the other hand, to have all of them declared one form of asset—a non-current asset. As ConRail and USRA have pointed out, there is the alternative of analyzing the accounts, so that they may be identified as current or non-current in nature, as the case may be.

The second reason advanced by the estates in support of the conclusion reached by the reorganization courts is that the accounts in question are not "available" to the trustees of the railroad estates. Although it is true that some of the funds are in accounts maintained by indenture trustees and thus are not available to the trustees of the railroads, it is equally true that other funds are in accounts maintained by the estates and so are available to their trustees.

As ConRail and USRA note, in one sense the accounts will be "available" depending on whether an order making them available is issued by a reorganization court. The estates do not dispute this point, calling it "essentially correct." However, they insist that *at this time* the accounts are not available. Such a response seems to avoid the thrust of the point made by ConRail and USRA, which is that if a reorganization court were to order, on a case-by-case basis, that certain of the accounts be made available for payment of pre-conveyance obligations, those accounts would then become available.[16]

The third point advanced by the reorganization courts is that Congress imposed a

---

**15.** The estates argue in response to ConRail and USRA that the phrase, "cash and other current assets," has a "plain meaning" that is tied into the meaning of such a phrase under the ICC system of accounts. However, this contention neglects to note that if the meaning of the statutory phrase were truly plain and self-evident, it would not be necessary to draw upon the terminology employed in the ICC system in order to define it. Indeed, it is precisely because the meaning of the statutory language is not plain that this issue on appeal presents a difficult question.

**16.** The estates argue that it is "anomalous" to say, on the one hand, that at least some of the funds in question may be available and, on the other hand, that the accounts should be examined in a case-by-case fashion to determine their status. The estates urge that these propositions are inconsistent because any case-by-case proceedings involving the escrow accounts could be expected to lead to "extensive litigation" of the creditors' claims relating to the accounts, and that the accounts thus cannot be thought to be available. Of course, there is a possibility of litigation involving at least some undetermined number of the accounts. Yet this supposition, however plausible it may be, does not establish that *all* of the accounts will be tied up in litigation, or that enough would be so engaged as to lead to the practical result of the unavailability of the funds at issue in this appeal.

Also, in our view, *In re Penn Central Transportation Co.*, 494 F.2d 270 (3d Cir. 1973), *cert. denied*, 419 U.S. 883, 95 S.Ct. 147, 42 L.Ed.2d 122 (1974), which dealt with a factual configuration and legal issues different from those involved in the present case, does not stand in the way of the conclusion here, for we decide only that there should be a case-by-case determination of the status of the accounts in question.

restricted time period for § 211(h)(3) hearings, and that the identification of the escrowed funds as "cash and other current assets" could not have been ascertained within such constraints. It is "simply inconceivable," Judge Fullam stated, that Congress could have intended that the issue "be resolved by March 31, 1976, or within any other time frame sufficiently brief to make the determinations useful for planning and administering the § 211(h)(1) loan program."

We recognize, of course, that the time period contemplated by the statute is a restricted one. However, Congress explicitly provided for the identification of "cash and other current assets" which were to be made available to satisfy certain pre-conveyance obligations. If some of the accounts may be deemed to be in the nature of current assets, they are to be identified as such by the reorganization courts, notwithstanding the difficulty of the assignment.

In addition, the procedure for identifying the accounts as current or non-current, a procedure whose structure admittedly should be left up to the reorganization courts, might well be tailored to meet the time-frame problem that has been singled out. As ConRail and USRA suggest, it would be possible to make a tentative identification of the escrowed funds as current assets at the time of issuing the § 211(h)(3) order; then, there could be a show-cause proceeding in which those with an interest in the accounts so marked off could contest the identification.

■ Thus, we conclude that although no pre-ordained procedure must be followed, the reorganization courts should undertake to see that the accounts in question are identified—on an account-by-account basis—so as to determine whether they are "cash and other current assets."[17] The precise nature of the inquiry is left to the discretion of the reorganization courts.

### D.

Accordingly, the orders of the reorganization courts will be vacated, and the proceedings will be remanded for action consistent with this opinion.

---

**17.** We do not hold—nor do ConRail and USRA contend—that all escrow accounts are "cash and other current assets." Rather, the reorganization courts should look individually at them to determine their status. *Cf. In the Matter of the Ann Arbor Railroad Company,* 414 F.Supp. 812 (E.D.Mich.1976).