591 F.2d 139
 5 Bankr.Ct.Dec. 58, Bankr. L. Rep. P 67,147
 In re The DUPLAN CORPORATION, Debtor.
CHEMICAL BANK, the First National Bank of Chicago, North
Carolina National Bank and Security Pacific
National Bank, Appellants,
v.
Alfred P. SLANER, as Trustee in Reorganization of The Duplan
Corporation, Debtor, Appellee,
United States Trust Company of New York, Successor Indenture
Trustee, Appellee,
Securities and Exchange Commission, Appellee.
 Nos. 8, 201, 202 and 393, Dockets 78-5009, 78-5011, 78-5013
and 78-5021.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 27, 1978.
Decided Nov. 17, 1978.
 
 Henry L. Goodman, New York City (Zalkin, Rodin & Goodman, New York City, Richard S. Toder, Andrew D. Gottfried and Richard A. Gerard, Washington, D. C., of counsel), for appellants, cross-appellants and appellees Chemical Bank, First Nat. Bank of Chicago, North Carolina Nat. Bank and Security Pac. Nat. Bank.
 Philip R. Mann, New York City (Shea, Gould, Climenko & Casey, New York City, Martin I. Shelton, New York City, of counsel), for appellant, cross-appellee and appellee Alfred P. Slaner.
 John P. Campbell, New York City (Curtis, Mallet-Prevost, Colt & Mosle, Stephen K. Bone and Robert G. Zack, New York City, of counsel), for appellant, cross-appellee, and appellee U. S. Trust Co. of N. Y.
 Jerome Feller, New York City (Securities and Exchange Commission, Washington, D. C., David Ferber, Irving H. Picard, Washington, D. C., Marvin E. Jacob, New York City, of counsel), for appellee Securities and Exchange Commission.
 Before FRIENDLY and MULLIGAN, Circuit Judges, and WYATT, District Judge.*
 FRIENDLY, Circuit Judge:
 
 
 1
 On August 31, 1976, The Duplan Corporation (Duplan) filed in the District Court for the Southern District of New York a petition for an arrangement under Chapter XI of the Bankruptcy Act. Little more than a month later the Bankruptcy Judge directed that reorganization should proceed under Chapter X. Alfred P. Slaner was thereafter appointed Trustee.
 
 
 2
 The appeals and cross-appeal now before us concern orders relating to the pleadings in an adversary proceeding filed against the Trustee under Chapter X Rule 10-701, which incorporates Part VII of the Bankruptcy Rules, by four banks (the Banks). These were Chemical Bank (Chemical), The First National Bank of Chicago (First Chicago), North Carolina National Bank (NCNB) and Security Pacific National Bank. A fairly lengthy summary of the pleadings is needed as background for the point concerning our lack of appellate jurisdiction, which we regard as dispositive.
 
 
 3
 The complaint, as amended and supplemented, alleged in substance as follows:
 
 
 4
 Duplan had entered into a Credit Agreement with the Banks dated as of December 31, 1974, which was later amended. On August 31, 1976, Duplan's indebtedness under the Credit Agreement aggregated $38,465,831.55, evidenced by promissory notes. At the same time Duplan and subsidiaries of Duplan had entered into a Security Agreement with NCNB, also later amended, then restated and further amended and supplemented, granting it, for itself and as agent for the other Banks, a security interest, duly perfected by NCNB, in collateral consisting of fixed assets owned by Duplan and their proceeds (Duplan Fixed Assets Collateral). Also at that time, Duplan had entered into a Pledge Agreement with First Chicago, for itself and as agent for the other Banks, under which Duplan later delivered to First Chicago all of the issued and outstanding common stock of six subsidiaries[1] and some preferred stock of one of these subsidiaries (the Stock Collateral). Both the Security Agreement and the Pledge Agreement had been executed in order to secure Duplan's obligations under the Credit Agreement (Duplan Liabilities). Duplan as debtor in possession and the Reorganization Trustee have sold portions of the Duplan Fixed Assets Collateral free of liens and the Reorganization Trustee intends to continue to do so; the Reorganization Trustee holds or has control over the proceeds of such sales (Duplan Fixed Assets Collateral Proceeds). Finally Duplan and one of its subsidiaries had entered into a Factoring Agreement with Chemical, which granted Chemical a security interest in all sums and all property of Duplan at any time to Duplan's credit or in Chemical's possession as security for all obligations of Duplan at any time owing to Chemical, whether arising under the Factoring Agreement or otherwise. At the time of the filing of the Chapter XI petition Chemical held $1,474,000 subject to the lien so created (Duplan Cash Credit Balance). The value of the Duplan Fixed Assets Collateral, the Duplan Fixed Assets Collateral Proceeds and the Stock Collateral was less than the amount owed by Duplan to the Banks under the Credit Agreement, and Chemical's share of those items of collateral even when added to the Duplan Cash Credit Balance was less than the amount owed by Duplan to Chemical under the Credit Agreement.
 
 
 5
 The complaint asked that an order and judgment be entered against the Reorganization Trustee:
 
 
 6
 A. declaring and determining that NCNB, for itself and as Agent for the Banks, and the Banks, hold valid first liens upon, and first security interests in, the Duplan Fixed Assets Collateral and the Duplan Fixed Assets Collateral Proceeds, subject only to such prior liens as are set forth on Schedule A annexed hereto, for the equal and ratable benefit of the Banks, to secure payment of the Duplan Liabilities owing to each of the Banks;
 
 
 7
 B. declaring and determining that First Chicago, for itself and as Agent for the Banks, and the Banks, hold valid first liens upon, and first security interests in, the Stock Collateral for the equal and ratable benefit of the Banks, to secure payment of the Duplan Liabilities owing to each of the Banks;C. declaring and determining that Chemical holds a valid first lien upon, and security interest in, the Duplan Cash Credit Balance and any additions thereto to secure payment of the Duplan Liabilities owing to Chemical;
 
 
 8
 D. authorizing and directing Chemical to apply the Duplan Cash Credit Balance as it may now or hereafter exist, in reduction of the Duplan Liabilities owing to Chemical;
 
 
 9
 E. requiring the Reorganization Trustee to account to NCNB for all sums or other dispositions of the Duplan Fixed Assets Collateral made on and after August 31, 1976, and upon such accounting, directing and instructing the Reorganization Trustee to turn over to NCNB, for the equal and ratable benefit of the Banks, all of the Duplan Fixed Assets Collateral Proceeds so accounted for, whether now or hereafter in existence by reason of subsequent sales and dispositions of the Duplan Fixed Assets Collateral, together with interest thereon from the dates any of the Duplan Fixed Assets Collateral were sold or disposed of by the Reorganization Trustee, or from the dates such Duplan Fixed Assets Collateral Proceeds came into the possession or control of the Trustee (together with interest thereon which may have been earned by or have accrued to Duplan as debtor in possession);
 
 
 10
 F. determining the monthly amounts of depreciation attributable to all unsold Duplan Fixed Assets Collateral used by the Trustee in the operations of the business of Duplan and directing and instructing the Reorganization Trustee to pay to NCNB, for the equal and ratable benefit of the Banks, such monthly amounts as determined for the periods of October 6, 1976 to October 31, 1976, November 1, 1976 to November 30, 1976, December 1, 1976 to December 31, 1976, and for each consecutive month thereafter on the first day of the succeeding month, commencing February 1, 1977, until further order of this Court;
 
 
 11
 G. directing the Reorganization Trustee to turn over to First Chicago, for the equal and ratable benefit of the Banks, all surplus proceeds arising from the discontinuance of the business of Suzanne and the liquidation of its assets, after payment or provision for all valid liabilities and obligations of Suzanne.
 
 
 12
 The answer of the Reorganization Trustee included, in addition to a general denial, numerous defenses and counterclaims, most of which were not directly involved in the orders under appeal but which we must nevertheless summarize, for reasons that will later appear. These included claims that the transfers to the Banks were voidable under § 70e(1) and, with respect to those transfers within the year preceding the filing of the petition, § 67d(2) of the Bankruptcy Act and various state laws[2] because they were made with actual intent to hinder, delay or defraud creditors of Duplan, were made while Duplan was insolvent and were without fair consideration, and left Duplan unreasonably small capital in its business with knowledge that Duplan would incur debts beyond its ability to pay as they matured. Other counterclaims against each Bank alleged that Duplan was insolvent during the four months preceding the filing of its petition, that the Bank knew or had reason to know this, and that the Banks received payments on account of antecedent indebtedness, which were voidable preferences under § 60a and b of the Bankruptcy Act. Four other counterclaims attacked setoffs made by each Bank at the time of the filing of the Chapter XI petition. Another counterclaim challenged the adequacy of the UCC-1 Financing Statements and the real estate mortgages filed by the Banks with respect to certain properties. The Reorganization Trustee further claimed that Chemical's effort to obtain a security interest in the Duplan Cash Credit Balance "by virtue of a minor clause in the Factoring Agreement", in the face of an alleged agreement between Duplan and the Banks that the only security for the Banks' advances would be the collateral other than the Duplan Cash Credit Balance, was unconscionable; another counterclaim against Chemical challenged Chemical's claims to the Duplan Cash Credit Balance on a different ground.
 
 
 13
 This brings us to the two parts of the answer of the Reorganization Trustee which gave rise to these appeals. The Second Defense and First Counterclaim against the Banks began in paragraph 7 of the Answer by alleging that at all times since at least March 1, 1975, Duplan "was in virtual default" under the Credit Agreement. It went on to say in paragraph 8 that "(b)y reason of their control of Duplan's finances and the presence of their representative on Duplan's Board of Directors, the Banks dominated the affairs of Duplan to their own benefit and to the detriment of other creditors of Duplan" in various ways. One way was preventing Duplan from properly writing down assets, thereby creating a delusive appearance of solvency to other creditors who continued to extend credit. Another way was that they acquiesced in or directed Duplan's repurchase of certain shares of its stock while Duplan was insolvent. The claim with which we are concerned, set forth in paragraph 8(b) of the Answer, is that they delayed the filing of a bankruptcy petition, "which the Banks knew to be necessary, so as to avoid the consequences which a timely petition would have caused to said Banks by:
 
 
 14
 (i) waiving defaults under the Credit Agreement (by amendment or otherwise);
 
 
 15
 (ii) acquiescing in, or directing, the payment by Duplan on August 4, 1976 of principal and interest to a holder of Duplan's 6% Subordinated note;
 
 
 16
 (iii) requiring Duplan to commence and continue discussions with a potential acquirer of Duplan; and
 
 
 17
 (iv) Chemical, prior to its resignation as Indenture Trustee as of April 28, 1976, disregarding its duties under the Indenture dated February 1, 1969 (the "Indenture"), between Duplan and Chemical, as Trustee (under which Duplan's 5 1/2% Convertible Subordinated Debentures ('debentures') were issued) and the Trustee Indenture Act of 1939 and failing to notify holders of debentures of the defaults under the Credit Agreement and the actual insolvency of Duplan, thereby continuing a market in debentures for unsuspecting purchasers as well as failing to disseminate information which might have resulted in a bankruptcy petition being filed against Duplan."
 
 
 18
 The Second Defense and First Counterclaim asked that, because of these various ways in which the Banks had "dominated" Duplan, the debt to the Banks be subordinated to all other indebtedness of Duplan.
 
 
 19
 The Seventeenth Counterclaim against Chemical arose out of its having been, as alleged in paragraph 8(b)(iv) of the answer, the trustee under an indenture relating to an issue of Duplan's 5 1/2% Convertible subordinated debentures due February 1, 1994, a post which Chemical resigned in April 1976. The counterclaim made two different, although possibly related, allegations: One was that the court had power under § 212 of the Bankruptcy Act to compel Chemical to render an accounting for its actions as Indenture Trustee and should exercise such power. The other was that:
 
 
 20
 To the extent that this Court determines the transfers of Collateral valid, Chemical should be required to hold any property received by it thereby for the benefit of the holders of debentures.
 
 
 21
 In October 1977 the Banks moved under F.R.Civ.P. 12(b)(6) to dismiss paragraph 8(b)(iv) of the Reorganization Trustee's Second Defense and First Counterclaim and all of the Seventeenth Counterclaim. Although notice of this motion was addressed only to counsel for the Reorganization Trustee, the motion elicited an opposing affidavit from a vice-president of United States Trust Company of New York (hereafter the Successor Indenture Trustee), which had succeeded Chemical as Trustee under the indenture relating to Duplan's subordinated debentures. This affidavit called the court's attention to an answer, later amended, which the Successor Indenture Trustee had filed subsequently to the Banks' notice of motion and pointed out that paragraph 13(b)(iv) and the Eighteenth Counterclaim in that answer asserted matters similar in substance to the portions of the Reorganization Trustee's answer that had been challenged. This precipitated a motion under F.R.Civ.P. 12 by the Banks to strike the "purported answer" of the Successor Indenture Trustee as "unauthorized."
 
 
 22
 Argument on the Banks' motion to strike the two portions of the answer of the Reorganization Trustee revolved mainly around the bearing of Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), where the Court held, affirming our en banc decision in 439 F.2d 118 (2 Cir. 1971), that on the facts there presented a reorganization trustee could not assert claims of debenture holders that an indenture trustee had failed to enforce covenants made by the debtor in the indenture. The district court ruled, on January 17, 1978, that Caplin did not require striking paragraph 8(b) (iv) of the Second Defense and First Counterclaim but did require striking the Seventeenth Counterclaim. In a separate opinion, entered February 22, 1978, the court denied the Banks' motion to strike the answer of the Successor Indenture Trustee on the ground that § 206 of the Bankruptcy Act provides that "(t)he debtor, the indenture trustees, and any creditor or stockholder of the debtor shall have the right to be heard on all matters arising in a proceeding under this chapter."
 
 
 23
 The Reorganization Trustee and the Successor Indenture Trustee took appeals from so much of the January 17 ruling as struck the Seventeenth Counterclaim; the Banks cross-appealed from so much of that ruling as refused to strike paragraph 8(b)(iv) of the Second Defense and First Counterclaim. The Banks also appealed from the denial of their motion to strike the answer of the Successor Indenture Trustee.
 
 
 24
 The brief of the Reorganization Trustee argued that we had no jurisdiction over the Banks' appeal of the portion of the January 17 order relating to paragraph 8(b)(iv) and of the February 22 order, since these were interlocutory, as they clearly were, and were made in a "controversy arising in a proceeding in bankruptcy" rather than in "a proceeding in bankruptcy," see Bankruptcy Act § 24a,[3] and, even if not, should be dismissed under the judicially created gloss that an appeal from a literally appealable interlocutory order should be dismissed if the issue is "trivial." See Hoehn v. McIntosh, 110 F.2d 199, 201 (6 Cir. 1940); Dutch American Mercantile Corp. v. Eighteenth Ave. Land Co., 302 F.2d 636, 637 (2 Cir. 1962), Cert. denied sub nom. Eighteenth Ave. Land Co. v. Cherno, 379 U.S. 834, 85 S.Ct. 64, 13 L.Ed.2d 41 (1964); Lesser v. Migden, 328 F.2d 47, 48 (2 Cir. 1964); In re Durensky, 519 F.2d 1024, 1028-29 (5 Cir. 1975); 16 Wright, Miller, Cooper & Gressman, Federal Practice and Procedure, § 3926 at 107-11 (1977). The Reorganization Trustee concedes as he must that if we should uphold the first of these grounds, his own appeal and that of the Successor Indenture Trustee from the striking of the Seventeenth Counterclaim must also be dismissed since the order did not adjudicate all the claims asserted in his answer, see F.R.Civ.P. 54(b), made applicable to adversary proceedings in bankruptcy by Bankruptcy Rule 754 and Chapter X Rule 10-701.[4]
 
 
 25
 We think the triviality exception calls for dismissal of the appeal from the refusal to strike paragraph 8(b)(iv). The Banks' motion, although nominally under F.R.Civ.P. 12(b)(6), did not contend that the Second Defense and First Counterclaim did not state a defense and claim upon which relief could be granted. In essence the motion was made, under F.R.Civ.P. 12(f), to strike redundant or immaterial matter. Since the subparagraph is contained in a legally sufficient defense and counterclaim against all the Banks, the pleading must be read as citing Chemical's inaction as Indenture Trustee as one element of the plan of all the Banks. Chemical's inaction, then, if relevant, could have been offered as proof of the portions of the defense and counterclaims to which no objection was raised.
 
 
 26
 On the other hand, we do not regard the triviality exception as applicable to the three other appeals. The dismissal of the Seventeenth Counterclaim was a ruling that as a matter of law the Reorganization Trustee was not entitled to impress a trust on property of Duplan which had come into Chemical's possession but was not recoverable on any of the other theories he had advanced. We likewise do not regard the refusal to strike the answer of the Successor Indenture Trustee as falling within the triviality exception. While this order did not settle any legal rights, it did decide a procedural question of significance not only to this proceeding but to every proceeding under Chapter X. The judicially created triviality exception is sufficiently flexible to allow the appeal of such an order, Cf. In re Ira Haupt & Co., 361 F.2d 164, 166 (2 Cir. 1966), if the order were issued in a proceeding in bankruptcy rather than in a controversy arising in such a proceeding, the question to which we now turn.
 
 
 27
 We begin with the ritualistic observation that "(t)he distinction between 'proceedings' and 'controversies' in Section 24(a) is obscure and indefensibly confusing." In re Brissette, 561 F.2d 779, 781 (9 Cir. 1977). As Judge Hufstedler there pointed out, endeavors to place a particular appeal in one box or the other are "exacerbated by continuing reliance on case law construing identical terms under pre-1938 jurisdiction statutes" although the consequences of the classification were quite different.[5]
 
 
 28
 The most difficult field for application of the controversy-proceedings distinction is that with which we are here concerned determining the validity of liens. The leading Supreme Court discussion is in Coder v. Arts, 213 U.S. 223, 29 S.Ct. 436, 53 L.Ed. 772 (1909). There a creditor, Arts, sought allowance of five notes against the bankrupt estate, "reserving all rights to his securities," to wit, two real estate mortgages. The trustee attacked both the amount of the claim and the validity of the mortgages, asserting that the mortgages were voidable as preferences, as fraudulent conveyances, and as transfers made within four months prior to the filing of the petition. The Court said that the case was one of a proceeding in bankruptcy, not one of a controversy arising in a bankruptcy proceeding, 213 U.S. at 235, 29 S.Ct. 436, 440. The reasoning was that Arts had simply "appeared in the bankruptcy court, recognizing the title and possession of the trustee in bankruptcy, asserted his claim upon the notes, and his right to have the assets so administered and paid as to recognize the validity of the lien for the security for his claim." Id. It was deemed immaterial that the filing of the claim entailed an "incidental right to consider and determine the validity and priority of the lien asserted upon the property in the hands of the bankrupt's trustee." Id.[6] In re Loving, 224 U.S. 183, 32 S.Ct. 446, 56 L.Ed. 725 (1912), is to the same effect. In contrast, prior to Coder v. Arts, the Court discerned a "controversy" in a case where a conditional vendor of machinery had petitioned for a declaration that it owned the machines and should be awarded possession thereof or be first paid from the proceeds. Hewit v. Berlin Machine Works, 194 U.S. 296, 24 S.Ct. 690, 48 L.Ed. 986 (1904).
 
 
 29
 No useful purpose would be served by citing the many opinions where other circuits have endeavored to apply the diaphanous distinction between Coder and Loving on the one hand and Hewit on the other.[7] A pertinent early case in this circuit is In re Interborough Consolidated Corp., 288 F. 334, 340 (2 Cir.), Cert. denied sub nom. De Rothschild v. Sheffield, 262 U.S. 752, 43 S.Ct. 700, 67 L.Ed. 1215 (1923), holding that a petition by bondholders to obtain payment of coupons out of funds deposited by the bankrupt in a bank for that purpose constituted a "controversy." Also relevant is In re Times Square Auto Supply Co., 47 F.2d 210 (2 Cir.), Cert. denied sub nom. Bank of United States v. Irving Trust Co., 283 U.S. 856, 51 S.Ct. 649, 75 L.Ed. 1463 (1931), holding that an application by a trustee for a turnover order to a bank that had made up an overdraft existing at the date of the bankruptcy out of post-petition deposits was a "controversy." This brings us to the two most recent Second Circuit lien cases, which seemingly look in opposite directions.
 
 
 30
 One of these is Hillcrest Lumber Co. v. Terminal Factors, Inc., 281 F.2d 323 (2 Cir. 1960). In Chapter XI proceedings, Terminal Factors had claimed a lien on lumber owned by the debtors. On their petition the referee in bankruptcy ordered that the lumber be sold and the net proceeds be held by Terminal Factors subject to the summary jurisdiction of the bankruptcy court. Nearly five years later the debtors, contesting the validity of the liens, petitioned to compel Terminal Factors to turn over the proceeds of the sale. On an appeal from an interlocutory order this court held that the proceeding was a "controversy" since it was a dispute "between the debtors and an adverse claimant concerning property within the summary jurisdiction of the bankruptcy court . . . ."[8] Id. at 325.
 
 
 31
 The other case, the only one in our survey which resembles the instant case in being under Chapter X, is the decision of a divided panel in Pettit v. Olean Industries, Inc., 266 F.2d 833 (2 Cir. 1959). So far as here relevant, the case concerned bank accounts and an account with a warehouse company containing proceeds of Olean Industries, Inc., all of whose shares had once been owned by the debtor but had been pledged to a Canadian company, which, prior to the bankruptcy petition, had foreclosed the pledge by a sale to itself. The substantive question on the appeal was whether, despite the foreclosure, the district court had properly assumed summary jurisdiction to determine the validity and amount of the Canadian company's lien. Before getting to that question the court had to determine whether the case was a proceeding or a controversy.
 
 
 32
 In holding the former, Judge Learned Hand began by laying down the broad proposition, 266 F.2d at 836:
 
 
 33
 It is well settled that before any sale in foreclosure the ascertainment of the validity and amount of the security for a claim against the debtor is a "proceeding in bankruptcy."
 
 
 34
 For this he cited Coder v. Arts, supra; Columbia Foundry Co. v. Lochner, 179 F.2d 630, 635 (4 Cir. 1950); and In re Greenstreet, Inc., 209 F.2d 660, 662 (7 Cir. 1954). Conceding that when a secured creditor sells the security to a third person, any challenge of the buyer's title by the debtor would be a "controversy" even if the sale were only colorable, he thought that when a pledgee buys in the security at such a sale his legal position remained the same as before a "pledgee in possession." Hence, the debtor's challenge of such a sale was a first step in a continuous proceeding "to determine summarily the value of the security" under Chapter X, § 197, which requires classification of creditors for the purposes of a Chapter X reorganization plan and its acceptance, and provides for a summary valuation proceeding if necessary to determine the value of the security. He could:
 
 
 35
 perceive no antecedent reason for supposing that, although other interlocutory decisions of the constituent steps in liquidating the claim are appealable, the determination of the validity of the pledgee's effort to change his position to that of an owner, should be an exception.
 
 
 36
 266 F.2d at 836.
 
 
 37
 Judge Lumbard disagreed with this jurisdictional holding. He thought the distinction between a controversy and a proceeding was "whether the claim asserted affects the extent rather than the administration of the estate."[9] Id. at 838. He then made the interesting observation that this test might have a different application in Chapter X proceedings than in ordinary bankruptcy since § 197, in connection with § 111, which vests in the court in which a petition is filed "exclusive jurisdiction of the debtor and its property, wherever located", "does impliedly announce the rule that for purposes of summary proceedings under Chapter X security in the hands of a creditor shall be deemed to be in the constructive possession of the court, thus altering the rule in ordinary bankruptcy" the purpose being "to compel secured creditors to participate in the general plan of reorganization, which would not have been possible under the rule which had developed in ordinary bankruptcy." However, he concluded that this did not justify the majority's holding in Pettit since the claim "was based solely on the assertion of an adverse title derived from a prior foreclosure as to which § 597 (§ 197) is irrelevant." Id.
 
 
 38
 On the basis of this review of the precedents we have no doubt that the present appeals would be "controversies" if this was an ordinary bankruptcy. The claim lettered D might qualify for characterization as a "proceeding" if it stood alone, since Chemical was simply asking for the right to set-off monies in its possession owing to Duplan in reduction of its claim. See McDaniel Nat. Bank v. Bridwell, 74 F.2d 331 (8 Cir. 1934), but compare In re Ben Hyman & Co., Inc., 577 F.2d 966 (5 Cir. 1978). In contrast the claims lettered A, B and C would be "controversies" in an ordinary bankruptcy under the distinction drawn in Coder in regard to cases where a creditor "intervene(d) in the bankruptcy proceedings for the purpose of asserting an independent and superior title to the property held by the trustees, claiming the right to recover the property and to remove it from the jurisdiction of the bankruptcy court as a part of the estate to be administered," 213 U.S. at 235, 29 S.Ct. at 440; see also In re Hartzell, supra note 7.[10] Even more clearly the claims lettered E, F and G, which ask the court to deplete the estate by paying out monies to creditors, are "controversies" within this court's decision in In re Interborough Consolidated Corp., supra, 288 F. at 340, see also In re Brendan Reilly Associates, Inc., 372 F.2d 235, 378 F.2d 30 (2 Cir. 1967); 2 Collier, Supra, P 24.31 at 776-77 (Reclamation Proceedings); P 24.33 (Liens).
 
 
 39
 No different result is warranted here because this is a Chapter X proceeding. If the claims for declaration of the validity of liens stood alone, it could be argued that the Banks were simply initiating the process, required by § 197, of fixing "the division of creditors and stockholders into classes according to the nature of their respective claims and stock," and, in the case of secured claims, of determining summarily the value of the security and classifying the excess as unsecured. Probably it was in recognition of the special nature of Chapter X proceedings that the Banks did not ask leave to foreclose on the Fixed Assets Collateral, the Fixed Assets Collateral Proceeds and the Stock Collateral. But the claims lettered D, E, F and G were reclamation claims and thus controversies. The language used by Mr. Justice Van Devanter in affirming the Hartzell decision, Supra note 7, that the petition and answer "brought into the bankruptcy proceedings a controversy which was quite apart from the ordinary steps in such proceedings" is exceedingly fitting here.
 
 
 40
 Our ruling that we now have no jurisdiction over these appeals does not mean that we cannot have it prior to the final decision of this dispute. As noted above, the dismissal of the Reorganization Trustee's Seventeenth Counterclaim is a final disposition and would be appealable but for the rule that a judgment is not final if other claims between the same parties remain pending, see 6 Moore, Federal Practice, P 54.04(3.-2) (1976). However, F.R.Civ.P. 54(b) would authorize the district court to confer the finality requisite to appeal on so much of its January 17, 1978 order as dismissed the Seventeenth Counterclaim of the Reorganization Trustee. If the Reorganization Trustee should apply for such a certificate, and if the district court should see fit to grant it, and the Reorganization Trustee should take a timely appeal, we, in accordance with our usual practice, will consider the appeal on the briefs already received and the argument already heard. See Coleman v. American Export Isbrandtsen Lines, Inc., 405 F.2d 250, 251 n. 1 (2 Cir. 1968); Wolfson v. Blumberg, 340 F.2d 89, 90 (2 Cir. 1965); 10 Wright and Miller, Federal Practice and Procedure, § 2660 at 89 & n. 87 (1973). If the Banks should apply for a certificate under 28 U.S.C. § 1292(b) with respect to the district court's February 22, 1978 order and if the district court should decide to issue such a certificate[11] and leave to appeal should be granted, the appeal could also be heard on the papers now before us without further argument.
 
 
 41
 Appeals dismissed for want of appellate jurisdiction. No costs.
 
 
 
 *
 United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 One of these was Lady Suzanne Foundations, Inc. (Suzanne). The complaint alleged that the Reorganization Trustee had determined that Suzanne's business should be discontinued and its assets liquidated
 
 
 [2]
 As well as 13 Eliz., c. 5 (1570)
 
 
 [3]
 This provides:
 The United States courts of appeals, in vacation, in chambers, and during their respective terms, as now or as they may be hereafter held, are invested with appellate jurisdiction from the several courts of bankruptcy in their respective jurisdictions in proceedings in bankruptcy, either interlocutory or final, and in controversies arising in proceedings in bankruptcy, to review, affirm, revise, or reverse, both in matters of law and in matters of fact: Provided, however, That the jurisdiction upon appeal from a judgment on a verdict rendered by a jury shall extend to matters of law only: And provided further, That when any order, decree, or judgment involves less than $500, an appeal therefrom may be taken only upon allowance of the appellate court.
 
 
 [4]
 The satisfaction of the Reorganization Trustee with this result, and his request to withdraw his appeal if we act adversely on the Banks' appeal of the February 22 order (as outlined in the final page of his brief), apparently is based on the fact that the Eighteenth Counterclaim of the Successor Indenture Trustee, which would then be left standing, tracked his Seventeenth Counterclaim. We do not understand this. The interests of the Reorganization Trustee and of the Successor Indenture Trustee are not identical. In footnote 5 of his brief the Reorganization Trustee states that to the extent that the Seventeenth Counterclaim and the parallel item in the prayer for relief request that transfers to Chemical be avoided for the benefit of debenture holders rather than all creditors, they are inconsistent with Moore v. Bay, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931), see 4B Collier, Bankruptcy, P 70.95 (1978), and that the Reorganization Trustee, if successful on his appeal from the January 17 order, would request authority from the bankruptcy court to amend his answer accordingly. On the other hand, the corresponding items in the answer of the Successor Indenture Trustee ask that Chemical be required to hold any property of Duplan, which it has received and is allowed to retain, for the benefit of the debenture holders. The Successor Indenture Trustee has not conceded and presumably would not concede that a contrary result is required by Moore v. Bay. Cf. In re Bowman Hardware & Electric Co., 67 F.2d 792 (7 Cir. 1933). The Reorganization Trustee would thus seem to have a real stake in the maintenance of his Seventeenth Counterclaim, if amended as he proposes
 
 
 [5]
 If we omit the substantial added complications arising from § 25 as enacted by the Bankruptcy Act of 1898 but thereafter importantly amended, see 2 Collier, Supra, P 24.02 at 696-99 (1976), in the period immediately before 1938, final orders in "controversies" were appealable as of right and as to matters of both law and fact whereas interlocutory or final orders "in proceedings" were appealable only by permission of the court of appeals and then as to matters of law only. In doubtful cases counsel chose both methods. See Id., P 24.03(4) at 705. Under § 24 as amended in 1938, save for an exception not here pertinent, appeal in both categories is of right and extends to matters of fact and law; a would-be appellant is now better off if the order was made "in proceedings in bankruptcy" since there is then no requirement of finality
 
 
 [6]
 The controversy-proceeding discussion in Coder was in the course of rejecting Arts' challenge to the appealability of the order of the district court to the court of appeals. The district judge had sustained the validity of one mortgage, the proceeds of which sufficed to pay the notes it had secured; he invalidated a smaller mortgage but allowed Arts to participate as a general creditor on the note it secured. The trustee took the case to the Eighth Circuit both upon petition to revise and by an appeal. That court, without much discussion, dismissed the petition to revise but took jurisdiction of the appeal, see 152 F. 943, 944 (8 Cir. 1907). Appellant argued that the case was a controversy, see 213 U.S. at 224, 29 S.Ct. 436; appellee contended it was a proceeding and, apparently, that the court of appeals lacked jurisdiction because it had dismissed the petition to revise. The Supreme Court rejected appellant's claim that the case presented a "controversy" but nevertheless upheld the jurisdiction of the court of appeals on the ground that the trustees' appeal to that court was within then § 25a(3) which permitted an appeal, in addition to the appeals and petitions to revise authorized by § 24, "from a judgment allowing or rejecting a debt or claim of $500 or over," see Id. at 236-37, 29 S.Ct. 441, and 2 Collier, Supra, at 696. Whether or not the controversy-proceeding discussion thus was in a sense dictum since the court of appeals seemingly had jurisdiction in any event, Coder v. Arts has so long been taken as the touchstone for determining the controversy-proceedings distinction in lien cases that this is immaterial
 
 
 [7]
 Two frequently cited cases, both finding a "controversy", one of which was affirmed by the Supreme Court, are In re Breyer Printing Co., 216 F. 878 (7 Cir.), Cert. denied sub nom. Borland v. Central Trust Co., 235 U.S. 701, 35 S.Ct. 203, 59 L.Ed. 432 (1914) (stressing that at the time of adjudication the creditor had possession of the goods constituting the security), and In re Hartzell, 209 F. 775 (8 Cir. 1913) (stressing that the mortgage creditor who had appeared in answer to a petition by the trustee "was not asserting its mortgage lien as an incident to the presentation for allowance of its claim against the general estate" but was making "a separate, independent, assertion of its mortgage," 209 F. at 778). The Hartzell case was affirmed Sub nom. Robert Moody & Son v. Century Savings Bank, 239 U.S. 374, 377, 36 S.Ct. 111, 60 L.Ed. 336 (1915), where Mr. Justice Van Devanter said that the trustee's petition had "every attribute of a suit in equity for the marshaling of assets, the sale of the encumbered property, and the application of the proceeds to the liens in the order and mode ultimately fixed by the decree" and that the petition and answer "brought into the bankruptcy proceedings a controversy which was quite apart from the ordinary steps in such proceedings . . . ."
 
 
 [8]
 Hillcrest was relied upon in Standard Electronics Corp. v. Kenneally, 336 F.2d 394 (8 Cir. 1964), the facts of which bear some resemblance to the instant case
 
 
 [9]
 At another point he said, 266 F.2d at 837:
 The standard and until now the workable criterion which governs the determination whether a "proceeding in bankruptcy" contains a "controversy" has been whether the claimant raises a dispute with regard to the propriety of including the property in the estate for distribution, rather than a question with regard to the administration of the estate once it is amassed.
 That formulation was followed by this court in United Kingdom Mutual S. S. Assurance Ass'n v. Liman, 418 F.2d 9, 10 (2 Cir. 1969). As there recognized, however helpful the formulation may be in some cases, it is not of great assistance in lien cases which involve both amassing and administering. See also In re Penn Central Transportation Co., 570 F.2d 1189, 1192-94 (3 Cir. 1978), finding a "proceeding" in a case where the accounts in controversy had admittedly been part of the railroad estates at the time of the transfer to ConRail.
 
 
 [10]
 Particularly in light of the Hartzell decision, see 2 Collier, Supra P 24.29 at 770 and P 24.33 at 779, we think Judge L. Hand's statement in Pettit, 266 F.2d at 836, quoted at p. 146 Supra, was too broad. The Columbia Foundry and Greenstreet cases, cited to support it, related to summary jurisdiction over counterclaims
 
 
 [11]
 The Supreme Court's opinion in Coopers & Lybrand v. Livesay, 437 U.S. 463, 475 98 S.Ct. 2454, 2461, 57 L.Ed.2d 351, 362 n. 27 (1978), indicates that the Court is willing to construe the phrase "a controlling question of law" in § 1292(b) to include a procedural determination that may importantly affect the conduct of an action. See 9 Moore, Supra, P 110.22(2) at 260 (1975), stating that "(t)he courts have tended to make the 'controlling question' requirement one with the requirement that its determination 'may materially advance the ultimate termination of the litigation' " and that "(t)he critical requirement is that it (an interlocutory appeal) have the potential for substantially accelerating the disposition of the litigation", and the cases there cited